# Richmond

## ALTON WAYE

### v.

## COMMONWEALTH OF VIRGINIA

January 12, 1979.

Record No. 780848.

Present: All the Justices.

*William L. Wellons; Richard J. Bonnie,* for appellant.

*Linwood T. Wells, Jr., Assistant Attorney General (Marshall Coleman, Attorney General,* on brief), for appellee.

CARRICO, J., delivered the opinion of the Court.

In a bifurcated proceeding conducted pursuant to Code §§ 19.2-264.3 and -264.4, a jury convicted the defendant, Alton Waye, of wilful, deliberate, and premeditated murder during the commission of or following rape, Code § 18.2-31(e), and fixed his punishment at death. Code § 18.2-10(a). Following receipt of the report of a probation officer, the trial court held a sentencing hearing. At the conclusion of the hearing, the court confirmed the jury's verdict and sentenced the defendant to death.

The defendant is here for automatic review of his death sentence. Code § 17-110.1(A). This review has been consolidated with the defendant's appeal from his conviction, and the matter has been given priority on our docket. Code §§ 17-110.1(F), -110.2. The defendant requests, alternatively, that we reverse and remand for trial upon a non-capital offense, that we reverse and remand for a new trial upon the capital murder charge, or that we commute the death sentence to life imprisonment.

The offense in question occurred in Lunenburg County. Upon the defendant's motion, however, a change of venue was ordered, and the case was tried in the Circuit Court of Mecklenburg County.

The evidence shows that the victim, a 61-year-old widow, lived alone in a house located nine-tenths of a mile from a public highway in a rural area of Lunenburg County. The defendant, a 22-year-old factory worker, lived with his father approximately two miles from the victim's home.

In the late afternoon of October 14, 1977, the defendant met a friend, Len Gooden, at a cafe in Kenbridge. After each had consumed several beers, they departed between 7:30 and 8:00 p.m. and obtained a ride to the defendant's home. From there, they embarked, with the defendant driving his own automobile, on a trip to Blackstone to "see a girl named Queenie." Apparently unsuccessful in finding "Queenie," the two men visited other towns in the area. Gooden slept throughout most of the trip, rousing only occasionally as the defendant drove around the countryside.

Between 10:00 and 10:30 p.m., Gooden roused momentarily when the defendant "drove up in the yard" of an unfamiliar house, stated that he "would be right back," and got out of the car. Gooden roused again when the defendant returned and announced that he had "killed the lady."

The defendant drove to his home and told his father that he had "killed a woman." The defendant then telephoned the sheriff's office, reported that he had "killed somebody," and gave his name and directions to his home.

When police officers arrived at the Waye residence, the defendant told them that he had "killed a woman and put her in a bathtub," but that he did not know whom he had killed. Asked where "it" happened, the defendant offered to show the officers where the killing occurred. The defendant accompanied the police officers and directed them to the victim's home. Following the defendant, the officers proceeded through a side door and then upstairs to a bathroom, where they found in the bathtub a woman's nude and mutilated body.

Immediately, the defendant was arrested and advised of "his rights under the Miranda decision." In the police car, the defendant stated that he "did it just like they do on television . . . wiped the knife and everything." He said also, "Man, wait until my friends hear about this."

At the police station, the defendant orally and in writing confessed to killing the victim. In the written confession, he stated that he went to the victim's home and asked to use her telephone. According to the defendant's statement, the victim, clad in a nightgown, admitted him and, without protest, accompanied him to her second floor bedroom. There, they engaged in sexual intercourse, during the course of which he bit her breasts, severing one nipple. Afterward, he struck the victim numerous times in the face with his fists. Then, he went downstairs, found a knife in a kitchen drawer, returned to the bedroom, and stabbed the victim. Dragging the body to the bathroom, he placed it in the bathtub and attempted to cover it with water. Unsuccessful in the attempt, he found a bottle of Clorox and poured the contents over the body. Before leaving the house, he ransacked the interior, took the telephone "off the hook," and turned on the television, hoping to make it appear that "someone had been in and robbed" the victim.

Inspection of the victim's home revealed that it was in shambles. Contents of drawers were strewn about the rooms. The victim's purse had been emptied on a desk. Blood stains appeared both upstairs and downstairs. The murder weapon, a butcher knife, was found on a table beside the victim's bloodsoaked bed.

Scientific evidence established that the victim's body suffered 42 separate stab wounds. The face was battered and bruised beyond recognition. Bite marks appeared on the breasts and buttocks. The hands bore several "defense wounds." The vaginal and anal cavities contained spermatozoa.

In this court, the defendant has raised numerous questions concerning both his conviction and his sentence. These questions relate to pretrial proceedings, incidents of the guilt trial, constitutional challenges to the death penalty statutes, incidents of the penalty trial, and the propriety of the death sentence. The questions will be discussed *seriatim*.

## I. Pretrial Proceedings

### A. Denial of Preliminary Hearing

The defendant contends that, through a "manipulative procedure" employed by the Commonwealth's Attorney, he was improperly denied a preliminary hearing on the charge of capital murder. He was originally detained, the defendant says, on a non-

capital charge of first degree murder, was granted a preliminary hearing on that charge, and was certified to the grand jury. Then, however, the defendant asserts, the Commonwealth's Attorney obtained indictments for both capital murder and first degree murder and proceeded to trial on the capital but not the non-capital offense. This procedure, the defendant maintains, circumvented his statutory right to a preliminary hearing on the charge for which he was ultimately prosecuted.

We disagree with the defendant. Code § 19.2-218 provides that "[n]o person who is *arrested* on a charge of felony shall be denied a preliminary hearing . . . ." (Emphasis added.) The defendant was not arrested on the charge of capital murder; he was indicted on that charge directly by the grand jury. The procedure employed in obtaining the indictment was not manipulative, and it did not work a denial of any statutory right to which the defendant was entitled. *Webb* v. *Commonwealth*, 204 Va. 24, 30-31, 129 S.E.2d 22, 27-8 (1963).

## B. *Juror Exclusion*

The defendant contends that the trial court erred in refusing to exclude for cause a prospective juror, Jessie Winn. On *voir dire*, the defendant asserts, Winn evidenced obvious partiality for the testimony of police officers and also displayed a lack of understanding of basic legal concepts, thus raising grave questions concerning his ability to sit impartially as a juror.

Winn was asked on *voir dire* whether he thought "a police officer as a witness is entitled to any greater credibility or belief than any other witness just because he is a police officer." When Winn indicated an affirmative belief, the trial judge stated his intention to "disqualify this gentleman." Defense counsel then sought and obtained permission to question Winn further. After several questions concerning his attitude toward the testimony of police officers, Winn stated:

> "Well, I don't know. I just don't know hardly what to say either way, to be fair with you. Close thing either way, the way I see it. I may be wrong."

Winn was asked also a number of questions concerning his understanding of presumption of innocence, reasonable doubt, and the alternative punishments available in a capital murder case. After receiving Winn's replies to these inquiries, defense counsel asked the court to exclude him because he "would not be able to sit on a panel and make an intelligent decision." The trial judge refused to exclude Winn, stating that, although Winn appeared "poorly educated," he seemed "to have a basic conviction of what's right and wrong, and he seem[ed] to be entirely fair and honest." Later, the defendant used a peremptory strike to eliminate Winn as a juror.

Whether Winn should have been excluded for cause was a matter within the sound discretion of the trial court. *Slade* v. *Commonwealth*, 155 Va. 1099, 1106, 156 S.E. 388, 391 (1931). Winn's ultimate attitude on the subject of the testimony of police officers was essentially neutral. His responses to the various questions propounded to him, while perhaps not displaying the grasp of a legal technician, satisfactorily indicated that he not only stood indifferent in the cause but also possessed sufficient intelligence to be able to afford the defendant a fair and impartial trial. Under these circumstances, we cannot say that the trial court abused its discretion in refusing to exclude Winn for cause.

### C. Use of "Death Qualifications" Voir Dire Questions

Pointing out that the trial court excluded for cause three prospective jurors because they voiced objection to imposition of the death penalty, the defendant contends that the use of "death qualifications" questions is improper. Such questioning, the defendant asserts, results in a jury biased in favor of the Commonwealth, thereby violating a defendant's rights to due process and an impartial trial under the Fifth, Sixth, and Fourteenth Amendments.[1]

---

[1] On brief, the defendant argues that the use of "death qualifications" questions also works a denial of equal protection because only in capital cases is the state permitted to exclude jurors on the basis of their views on punishment. This point was not raised in the court below, and it is not the subject of an assignment of error. We will not notice the point here. Rule 5:21.

The defendant cites no authority for this argument. He acknowledges that the trial court's action in excluding the three prospective jurors was not violative of the principles enunciated in *Witherspoon* v. *Illinois*, 391 U.S. 510 (1968). We believe that if, as *Witherspoon* permits, a prospective juror may be excluded because he is opposed to imposition of the death penalty, it is not constitutional error to inquire into his beliefs concerning capital punishment.

## II. *Incidents of the Guilt Trial*

### A. *Remarks of the Commonwealth's Attorney in Opening Statement*

■During his opening statement, the Commonwealth's Attorney described to the jury the circumstances under which the police officers found the victim's body. After tracing the officers' path to the second floor of the victim's home, the prosecutor stated, "and there . . . laid a woman . . . with her face beaten so badly that I knew her personally but could not recognize her. I was there . . . ." Upon objection by the defendant, the trial court rebuked the prosecutor, told the jury that the prosecutor's statement was not evidence, and instructed the jury to ignore the statement. The prosecutor apologized. The defendant's motion for mistrial was denied.

The defendant contends that the prosecutor's remarks were so prejudicial that their effect could not be removed by any admonition from the trial court. A Commonwealth's Attorney in the rural setting of southside Virginia is accorded great respect, the defendant says, and the personal observations voiced by the prosecutor here indelibly impressed upon the jurors' minds his personal knowledge of the facts.

We do not believe that the denial of the defendant's motion for mistrial constituted reversible error. There was no issue in the case of the extent of the mutilation of the victim's body; uncontradicted evidence admitted during the course of trial established that the victim's face had been beaten beyond recognition. The prosecutor's reference to his personal observations, while improper, added nothing to the gruesome picture revealed by the evidence. The trial court's prompt action in admonishing the jury was sufficient to remove any harmful effect that might possibly

have resulted from the prosecutor's remarks. *Saunders* v. *Commonwealth*, 218 Va. 294, 303, 237 S.E.2d 150, 156 (1977).

## B. *Admission of Photographs*

At trial, over the defendant's objection, the trial court admitted into evidence several black-and-white photographs showing the victim's body in the bathtub where it was found. The Commonwealth had other evidence available, the defendant says, sufficient in quality and quantity to show the condition of the body and to establish malice, deliberation, and premeditation. The photographs displayed the victim's body in a hideous and grotesque fashion, the defendant asserts, and tended to overemphasize the severity of the wounds. Thus, the defendant concludes, any probative value of the photographs was outweighed by their prejudicial and inflammatory effect.

The admission of the photographs rested within the sound discretion of the trial court, and, in the absence of an abuse of discretion, we will not disturb the court's action. While the Commonwealth did have other evidence available to establish the elements of the offense, the photographs portrayed more graphically, but not more inflammatorily, than the testimony of any witness the methodical manner in which the killing of the victim was accomplished. Thus, the photographs were " 'relevant and material to establish premeditation and malice and to show the degree of atrociousness of the crime. ' " *Smith* v. *Commonwealth*, 219 Va. 455, 467, 248 S.E.2d 135, 143 (1978); *Brown* v. *Commonwealth*, 212 Va. 515, 519, 184 S.E.2d 786, 789 (1971).

## C. *Admissibility of the Defendant's Oral and Written Statements and Physical Evidence Removed From His Body*

The defendant contends that the incriminating statement he made at his home, that he had "killed a woman," and his subsequent oral and written statements were erroneously admitted into evidence. The statements were inadmissible, the defendant says, because he was not given his *Miranda*[2] warnings until after the victim's body was discovered and because he was so intoxi-

---

[2] *Miranda* v. *Arizona*, 384 U.S. 436 (1966).

cated and in such mental state at the time he made the written confession that he was incapable of appreciating the warnings and making an intelligent waiver of his rights.

Both in a pretrial hearing held on the defendant's motion to suppress his statements and at trial, where the motion was renewed, undisputed evidence showed that, when the police officers arrived at the Waye residence and before the defendant was asked a single question, he volunteered the statement that he "had killed a woman and put her in a bathtub." Thereafter, and until the victim's body was discovered, the defendant was asked only two questions, relating to "who" and "where." He responded to the first question by stating that he did not know whom he had killed and to the second by offering to show the police officers where the killing occurred. En route to the murder scene, the defendant, without questioning, repeated the statement that he "had killed a woman and put her in a bathtub."

Admittedly, the defendant was not given the *Miranda* warnings until after the victim's body was discovered. But *Miranda* does not apply to "volunteered statements," 384 U.S. at 478, or to responses to general "on-the-scene questioning as to facts surrounding a crime." 384 U.S. at 477. *Miranda* applies only to "custodial interrogation," *viz.*, "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444.

Here, the statements made by the defendant before discovery of the victim's body were either volunteered or uttered in response to general investigatory questions posed at a time when the police were not even certain that a crime had been committed. Furthermore, until the body was discovered, the defendant was not in custody or otherwise deprived of his freedom in any significant way; he accompanied the officers to the murder scene voluntarily and at his own suggestion. Thus, the lack of *Miranda* warnings before discovery of the victim's body did not render inadmissible any of the defendant's statements.

The question of the defendant's intoxication and mental state will be discussed in greater detail in later portions of this opinion. It suffices to say at this point that the record does not support the defendant's position that his written confession was inadmissible because he was incapable of appreciating the *Miranda* warnings and making an intelligent waiver of his rights.

■ The defendant contends further that the court erroneously admitted into evidence pubic hairs removed from his body. Citing *Rochin v. California*, 342 U.S. 165 (1952), the defendant argues that the plucking of his pubic hairs was offensive and violative of the community's sense of decency.

*Rochin*, however, involved the removal of drug capsules from the stomach of an accused by use of an emetic forcibly administered. Here, removal of the defendant's pubic hairs, pursuant to a search warrant, was unaccompanied by the "brutal" and "offensive" force condemned in *Rochin*, and amounted to no more than a minor intrusion upon the defendant's body under limited conditions. *Schmerber v. California*, 384 U.S. 757, 772 (1966). Accordingly, we find no error in the admission of the hairs into evidence. *Moore v. Commonwealth*, 211 Va. 569, 570, 179 S.E.2d 458, 460 (1971).

### D.  *Psychiatric Testimony*

■ The defendant called as an expert witness Dr. Charles Christian, a psychiatrist. After stating his qualifications, Dr. Christian testified before the jury that the defendant, while not insane, was of "normal intelligence, but of very low normal intelligence." When the doctor stated that he had some "psychological explanations . . . relative to the charges . . . being tried today," the jury was excused so that the trial court could "determine the admissibility of this evidence."

Out of the presence of the jury, Dr. Christian testified that, from his examination of the defendant, he was of opinion that the defendant suffered, not from a permanent disorder, but from "permanent traits and characteristics." The doctor opined further that a combination of factors, psychological as well as external, probably operated to cause the defendant to act impulsively at the time of the offense, "without giving much forethought or any forethought to it or planning or deliberation." The factors Christian listed were the defendant's "low normal intelligence," his tendency to confuse sexuality and aggression and to suppress his aggressive feelings, his preference for older women as sexual partners, his probable intoxication, and the sexual stimulus presented by the victim's appearance in a nightgown. While Christian stated his opinion that the defendant probably did not act out of

"any desire or premeditation" in killing the victim, he was unwilling to testify that the defendant could not "entertain a deliberate and willful desire to kill."

A discussion followed between the trial court and counsel concerning the admissibility of Dr. Christian's proffered testimony. The defendant now says that the trial court excluded "virtually all" of Dr. Christian's proffered testimony. This action, the defendant asserts, deprived him of the opportunity to establish and have the jury consider, not the defense of insanity, but the defense of "diminished capacity." Under the latter defense, the defendant maintains, an accused may introduce evidence in a first degree or capital murder case to show that, at the time of the commission of the crime, he lacked the mental capacity to form the requisite specific intent. The defense of "diminished capacity," the defendant says, was recognized in Virginia in *DeJarnette* v. *Commonwealth*, 75 Va. 867 (1881), and has been recognized also by 31 states and the Model Penal Code.

We need not and, therefore, do not decide in this case whether the defense of "diminished capacity" is or should be the rule of general application in Virginia. We read the record differently from the defendant. We believe that, in his appellate arguments, the defendant has misinterpreted the trial court's ruling on the disputed psychiatric testimony and that he has overlooked an instruction granted below that permitted him to argue and have the jury consider the essential elements of his "diminished capacity" defense.

When the proffer of Dr. Christian's testimony was completed, the trial court initially indicated that it considered the testimony inadmissible. In the ensuing discussion, however, the court changed its view. At one point, the court told defense counsel, "I'll let you do this: you can ask [Dr. Christian] the type of personality the man has." Later, the court went further and stated, "I think that to be utterly fair to you that I will permit you to ask [Dr. Christian] what he found insofar as the type of personality [the defendant] has, and his low mentality." Finally, the following colloquy took place between court and counsel:

> "MR. WELLONS [defense counsel]: Your Honor, before the jury comes back, I don't want the Court to call me down for asking questions that I shouldn't. I'm going to ask him about his mentality, his intellectual capacity. I'm going

to ask him what he observed about his personality traits.

"Now, I'm not going to ask him about any opinion as to what his intent was . . . .

"THE COURT: That's my ruling . . . .

"MR. WELLONS: He can present his objective findings?

"THE COURT: He can tell what we just talked about: low intelligence, a withdrawing tendency, suppressed hostility. They were personality problems, and I will permit him to testify for whatever it might be worth, but I don't really think it's admissible, but I don't want to do anything that would jeopardize this man's case. So, I will permit his findings to come in, but not any speculation as to what may have existed."

As we interpret the court's ruling, what the court ruled inadmissible was Dr. Christian's opinion concerning "what may have existed," *viz.,* "what [the defendant's] intent was," expressed by Dr. Christian in the proffer in terms of the probability that the defendant acted without "any forethought . . . or planning or deliberation . . . or desire or premeditation" in killing the victim. Contrary to what the defendant now says, the court did not rule inadmissible evidence that the defendant was incapable of deliberating and premeditating at the time of the killing. In any event, however, the doctor had stated in the proffer that he could not express the opinion that the defendant was so incapable.

The proffered expert opinion, that the defendant did not, in fact, deliberate and premeditate at the time of the killing, was properly ruled inadmissible. This opinion went to the "precise or ultimate fact in issue" in the case; to have admitted the opinion would have invaded the province of the jury. *Cartera* v. *Commonwealth,* 219 Va. 516, 519, 248 S.E.2d 784, 786 (1978); *Painter* v. *Commonwealth,* 210 Va. 360, 368, 171 S.E.2d 166, 172 (1969).

Following the trial court's ruling, Dr. Christian testified before the jury that the defendant was of low normal intelligence, representing a case of "borderline . . . mental retardation," that he was "a passive-aggressive dependent personality type," meaning he "keeps his aggressive feelings . . . his angry feelings . . . on the inside," and that he "tends to take a lot off other people to avoid trouble." The only time the trial court intervened to limit the testimony was when defense counsel asked the witness, "What are the dangers involved in a personality of this type?" The court properly indicated that this sort of testimony was not relevant in the guilt stage of the trial. *Farris* v. *Commonwealth*, 209 Va. 305, 163 S.E.2d 575 (1968).

Later, at the defendant's request, the trial court granted Instruction G, which reads as follows:

> "If at the time of the homicide the defendant, Alton Waye's state of mind was caused by passion, anger, or rage and was such that a reasonable doubt exists as to his having acted deliberately and with premeditation, you cannot find him guilty of capital murder, or first degree murder."

While this instruction may not have defined perfectly the "diminished capacity" defense, counsel for the defendant employed the instruction to advance that very defense before the jury. After stressing the burden upon the Commonwealth to prove that the defendant deliberately and premeditatedly killed the victim, counsel told the jury that it was the defendant's "state of mind that we are talking about" and that the question was whether, on the night of the killing, the defendant's mind was "in such a state that he was able to premeditate or deliberate over what he was going to do."

Counsel then read Instruction G to the jury and suggested that the defendant acted out of passion, anger, or rage. Counsel argued that, because of the defendant's intoxication, low intelligence, and passive-aggressive personality, he was "just like a time bomb there that evening. Something popped. He exploded and [the victim] was killed." Counsel told the jury that, although the defendant was guilty of a criminal offense, he was not guilty of capital murder because "in his state of mind he was not capable" of deliberating and premeditating. Counsel concluded by stating that the Common-

wealth had failed to prove the elements of deliberation and premeditation "because of the state of mind of the defendant, Alton Waye, as borne out by the psychiatrist and as was borne out by the evidence."

We find no error prejudicial to the defendant in the ruling of the trial court concerning the psychiatric testimony.

### E. Voluntary Intoxication Instruction

■ Citing the Virginia rule that an accused in a first degree murder case is entitled to have the jury consider intoxication in determining whether the killing was deliberate and premeditated, the defendant contends that the trial court erred in refusing his offered instruction on the subject. Testimony presented at trial, the defendant says, showed that he "had been drinking alcoholic beverages, thus raising the factual issue of his drunkenness . . . and providing evidence on which to base the instruction."

It is true, as the defendant asserts, that his companion on the night in question, Len Gooden, testified that the defendant was "drunk." But Gooden admitted that he had no qualms about riding with the defendant and that the latter drove "all right." Further, all the other evidence in the case, including the testimony of the defendant's father, showed that, while the defendant may have been drinking, he was not intoxicated.

The evidence in this case concerning intoxication rises no higher than, if as high as, that in *Hatcher* v. *Commonwealth*, 218 Va. 811, 241 S.E.2d 756 (1978). There, we said that, although the evidence showed that the accused had been drinking on the day of the offense, the evidence was "insufficient to show that he was so intoxicated as to render him incapable of committing a wilful, deliberate and premeditated act designed to kill the deceased." 218 Va. at 814, 241 S.E.2d at 758. In *Hatcher*, we found no error in the refusal of an instruction on voluntary intoxication. We find no error here.

### III. Constitutional Challenges to the Death Penalty Statutes

### A. Facial Constitutionality

■ In his assignments of error, the defendant challenged the facial constitutionality of Virginia's capital sentencing procedure.

Subsequent to the filing of the assignments of error, but before the defendant's case was argued, we decided *Smith* v. *Commonwealth, supra,* 219 Va. 455, 248 S.E.2d 135 (1978), the first case to come before this court under Virginia's revised death penalty statutes. Against challenges that the statutes were facially invalid under the Eighth and Fourteenth Amendments to the Constitution of the United States, we upheld the statutory procedure, ruling that it conformed to the requirements enunciated by the United States Supreme Court in the death penalty cases of *Gregg* v. *Georgia,* 428 U.S. 153 (1976), *Proffitt* v. *Florida,* 428 U.S. 242 (1976), and *Jurek* v. *Texas,* 428 U.S. 262 (1976).

The defendant acknowledges that we rejected in *Smith* the same arguments against the facial validity of the statutes that are encompassed within his assignments of error. Accordingly, and for the reasons assigned in *Smith,* we reject the arguments here.

B. *As Applied Constitutionality—Instructions Concerning the Death Penalty*

In one of his assignments of error, the defendant challenges the as applied constitutionality of the death penalty statutes. In a separate assignment, he attacks the instructions granted by the trial court concerning the jury's role in deciding whether, depending upon the existence of aggravating or mitigating circumstances, the death penalty or the lesser punishment of life imprisonment should be fixed. The defendant's arguments relating to the two subjects are duplicative, and the arguments reduce themselves to this single proposition: the jury's discretion in deciding whether to fix the death penalty was structured by instructions which merely "parroted" statutory language without correlating aggravating[3]

---

[3] "[T]here is a probability that the defendant would commit criminal acts of violence that would constitute a continuing serious threat to society or . . . his conduct in committing the offense for which he stands charged was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or an aggravated battery to the victim." Code § 19.2-264.2.

and mitigating[4] circumstances and, as a result, a presumption was created in favor of the aggravating circumstances, thus generating the likelihood that the death penalty would be fixed under the influence of passion, prejudice, or other arbitrary factor.

In the *Smith* case, substantially the same argument was advanced against an instruction there granted that dealt with the circumstances under which the death penalty or the lesser punishment of life imprisonment might be imposed. Citing United States Supreme Court decisions, the defendant there argued that, before an accused may be sentenced to death, the sentencing authority must consider mitigating as well as aggravating circumstances and that the instruction failed to advise the jury that, even though it found the existence of aggravating circumstances, the death penalty was not mandatory.

Rejecting the arguments in *Smith* , we said that, consonant with the death penalty statutes, the challenged instruction required the jury to consider both aggravating and mitigating circumstances and that the jury was at liberty, notwithstanding proof of aggravation, to afford the defendant mercy in consideration of mitigating factors and to fix the lesser punishment of life imprisonment. Such discretion in the sentencing authority, we stated, is not constitutionally infirm. 219 Va. at 479, 248 S.E.2d at 150. We said in another portion of the *Smith* opinion that the statutory definitions of the aggravating circumstances warranting imposition of the death penalty do not "vest the sentencing authority with standardless sentencing power." 219 Va. at 477, 248 S.E.2d at 148.

For the same reasons that were assigned in *Smith*, we do not believe that the instructions granted in the present case created any presumption in favor of the aggravating circumstances, generated any likelihood that the death penalty would be fixed as a result of passion, or resulted in any unconstitutional application of the death penalty statutes.

---

[4] "Facts in mitigation may include, but shall not be limited to, the following: (i) The defendant has no significant history of prior criminal activity, or (ii) the capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance or (iii) the victim was a participant in the defendant's conduct or consented to the act, or (iv) at the time of the commission of the capital felony, the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was significantly impaired; or (v) the age of the defendant at the time of the commission of the capital offense." Code § 19.2-264.4(B).

## IV. *Incidents of the Penalty Trial*

### A. *Jury Exposure to Outside Influences*

The sentencing stage of the defendant's trial commenced the morning after the jury returned its guilty verdict. Overnight, without objection, the jurors were unsequestered. When court convened before the sentencing trial, defense counsel moved the court to question the jurors "as to what newspaper articles they have read . . . as to the extent of the television exposure that they have had" and "as to the extent of their discussions with members of the family" and "other people." Noting that the jurors had been warned against outside exposures "on every occasion in which they left the presence of the Court," the trial court denied the defendant's motion.

The defendant argues that, because this was a capital murder case, the trial court should have taken greater precautions to ensure, by questioning the jurors, that there had been "no improper discussion or exposure." But nothing was submitted to the court to indicate that the jurors had been exposed to prejudicial outside influences. Where there is no substantial reason to fear prejudice, a trial court is not required to question jurors concerning their possible exposure to information outside the courtroom. *United States* v. *Hankish*, 502 F.2d 71, 77 (4th Cir..1974). In the absence of some showing of juror exposure to prejudicial information, it will be presumed that the jury followed instructions to avoid such exposure. *See United States* v. *Pomponio*, 517 F.2d 460, 463 (4th Cir.), *cert. denied*, 423 U.S. 1015 (1975).

### B. *Rebuttal Argument*

The defendant contends that it was improper to permit the Commonwealth's Attorney to rebut the defendant's closing argument in the sentencing stage of the trial. This argument was also advanced in *Smith*. Pointing out that, in the sentencing stage of a capital murder trial, the prosecution has the burden of proving aggravating circumstances beyond a reasonable doubt, we rejected the argument in *Smith*. 219 Va. at 480, 248 S.E.2d at 150. For the same reason, we reject the argument here.

### C. *Length of Jury Deliberation*

██ Emphasizing that the jury took only 25 minutes to return its death verdict, the defendant argues that it is inconceivable that his sentence received the mature, careful, and calm deliberation the full range of issues required. The haste with which the verdict was returned, the defendant asserts, amounts to a denial of "Eighth Amendment due process" and conclusively demonstrates that the finding "does not manifest a mature and deliberate decision that 'death is the appropriate punishment in a specific case,' *Woodson* v. *North Carolina*, 428 U.S. 280, 305, and that the jurors did not treat the defendant 'with that degree of respect due the uniqueness of the individual.' *Lockett* v. *Ohio*, [98 S.Ct. 2954, 2965 (1978)]." In avoidance of the possibility that a death sentence may be returned "under the influence of passion," the defendant maintains, this court must assume the responsibility to ascertain not only that the jury had the opportunity to make an individualized determination but also that it "did *in fact* make an individualized decision."

Significantly, the defendant does not cite a single authority for the proposition that the length of time a jury deliberates is sufficient, standing alone, to nullify a verdict. On the other hand, the authorities we have examined reject such a proposition. *E.g.,* *Kimes* v. *United States*, 240 F.2d 301 (5th Cir.), *cert. denied*, 354 U.S. 912 (1957).

We know of no measure for determining how long a jury should deliberate in a capital murder, or any other, case. We are concerned in any case, of course, that a verdict shall not have been returned under the influence of passion and prejudice. But, in the present matter, the mere fact that the jury deliberated no more than 25 minutes provides no indication that it did not maturely, carefully, and calmly deliberate the full range of issues or that it did not make an individualized decision on the defendant's sentence. All the period of deliberation indicates is that the jury labored under no uncertainty concerning the punishment it should fix.

D. *Probation Officer's Report*

██ Before imposing the death sentence fixed by the jury, the trial court considered the report of a probation officer. Code § 19.2-264.5. The report contained this statement:

"This is one of those times when a man should not take a passive position. In my investigation I have not found any extenuating circumstances that would cause me to disagree with the findings of the jury in this case; therefore, my conscience compels me to endorse the jury's verdict and the jury's sentence."

Citing *Linton v. Commonwealth*, 192 Va. 437, 440, 65 S.E.2d 534, 536 (1951), the defendant argues that it is improper to include in a probation report a recommendation of what sentence should be imposed. Accordingly, and considering the inflammatory and prejudicial nature of the probation officer's comments, it was error, the defendant asserts, for the trial court to admit the report into evidence.

The record shows that, when objection was raised to the report, the trial judge indicated that the probation officer's recommendation was not relevant and would not influence the court in its decision. We will assume, therefore, that the recommendation did not influence the court. Accordingly, inclusion of the recommendation, if error, was harmless.

## V. *Propriety of the Death Sentence*

Insisting that his sentence of death was imposed under the influence of passion and that the sentence is excessive and disproportionate in relation to his culpability, the defendant urges this court "to set the sentence aside under § 17-110.1(C)." This, the defendant says, is the "only avenue of relief currently available."

Code § 17-110.1(C) provides that, in "addition to consideration of any errors in the trial court enumerated by appeal," this court shall determine (1) whether "the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor," and (2) whether the sentence "is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Under § 17-110.1(D), in "addition to the review and correction of errors in the trial of the case," this court may commute the sentence of death to imprisonment for life.

### A. *Product of Passion*

The defendant reasserts all the errors he claims were committed in the trial of his case, emphasizing the hastiness with which the death verdict was returned. The cumulative effect of these errors, the defendant maintains, was to produce a verdict influenced by passion.

In other parts of this opinion, we have considered each matter of which the defendant has complained. We have not found reversible error in any individual instance, and we do not now find that the cumulative effect of the alleged errors was to produce a sentence influenced by passion. Paralleling what we said on a similar point in *Smith, supra*, we assume that the jurors were aroused by conduct which they found "outrageously or wantonly vile, horrible or inhuman." 219 Va. at 481, 248 S.E.2d at 151. If this was their reaction, it would not have been unnatural or unexpected. We cannot say that the reaction would have been either lessened or increased by the absence or presence of the trial incidents of which the defendant complains.

B. *Excessiveness*

The defendant contends that his death sentence is excessive in relation to his culpability because the aggravated nature of the offense he committed was attributable, not to a depraved or evil mind, but to an "acute mental disturbance triggered in a psychologically susceptible individual by an explosion of unconscious forces of sexuality and aggression." Under these circumstances, the defendant asserts, a death sentence is both unjustified from a penological standpoint and disproportionate not only to the severity of his offense but also to the penalty imposed in similar cases. Given the evidence of his youthfulness, his mental condition, and his prior good record, the defendant says, this court should find that the aggravated nature of his offense was attributable to a "mitigating mental abnormality" and should set aside his death sentence.

We do not believe, however, that, on the present record, this court would be justified in finding that the aggravated nature of the offense committed by the defendant was attributable to his alleged mental condition. Instead, we believe the evidence leads reasonably and inevitably to the conclusion that the atrociousness of the offense resulted from a depraved or evil, rather than a disturbed,

mind. The imposition of the death sentence in this case, therefore, is neither lacking in penological justification nor disproportionate to the severity of the offense.

Neither do we believe that the sentence imposed upon the defendant was disproportionate to the penalty imposed in similar cases. The *Smith* matter is the only other case to come before this court under the revised death penalty statutes. We upheld the death sentence there imposed against the claim that it was excessive. If one can conceive of a capital murder more aggravated than the one involved in *Smith,* the offense in the present case fits the concept.

Giving the defendant's case both appellate and independent review, we find no reversible error in the defendant's conviction and sentence and no other reason to disturb or commute his death sentence. Accordingly, we will affirm the judgment of the trial court.

*Affirmed.*