## Richmond

WALTER J. KEIL

v.

COMMONWEALTH OF VIRGINIA

June 12, 1981.

Record No. 800994.

Present: All the Justices.

*Richard S. Gordon* for appellant.
*Vera S. Warthen, Assistant Attorney General (Marshall Coleman, Attorney General,* on brief), for appellee.

HARRISON, J., delivered the opinion of the Court.

Walter J. Keil was convicted of the capital murder of Sonja Elsa Dorey and his punishment fixed by a jury at life imprisonment. Judgment was entered accordingly. He argues on appeal that there is insufficient evidence to support a finding that the victim's death occurred during the commission of or subsequent to her rape. He also challenges the court's refusal to question the jurors to determine if, during his trial, they had read certain arti-

cles published in local newspapers which were allegedly erroneous, misleading, and prejudicial.

On October 21, 1979, Sonja Dorey, age sixteen, received a phone call "around" 2:00 p.m. She left her home on Denbigh Boulevard in Newport News approximately one-half hour later and entered a dark green, four-door automobile driven by a male. Although she had indicated she would return later, her family never again saw her alive. Neither her mother nor her younger brother, Arnold, recognized the driver of the green automobile. Arnold remembered that the driver "had a big nose" and a "'50's, Fonzie style hairdo." He saw the automobile head "towards the pier" located in a park near his home. He estimated that an hour or two later the car returned down Denbigh Boulevard without his sister.

John Blanche and two other boys were in an area located at the end of Denbigh Boulevard on November 15, 1979. This area contained a large gravel parking lot, public nature trails, and a marsh with bushes and undergrowth. Off the wooded trail "in marsh area like, in some water" Blanche and his companions found "a pretty badly decomposed" body lying on its back. They immediately reported this discovery to the police. Detective L. M. Hudson, an Evidence Specialist for the Newport News Police Department, testified that he proceeded to a secluded area in the park. He described the body as "laying [sic] on its back, the legs were spread, the arms at the side." The only clothes remaining on the corpse were a beige T-shirt and a white brassiere which had been pulled up to her neck, and a pair of white knee socks with red stripes. Her blue corduroy jeans had been removed and were lying on her right ankle. One of her shoes was located fifteen to twenty feet from her body. Her ID card and an empty Marlboro 100's cigarette package were found nearby. Hudson did not find any underpants although Sonja's mother testified that her daughter always wore underpants.

Dr. Faruk Presswalla, the Deputy Chief Medical Examiner in charge of the Tidewater Virginia District, performed an autopsy on the body after identifying it by dental records as that of Sonja. He testified that the body was moderately decomposed and unclothed except for the shirt and brassiere pulled up to the shoulders and a pair of socks. An external examination disclosed no obvious signs of injury, except for bruising around the dilated anal opening. Decomposition and post mortem injuries around the eyes,

lips, ears, and fingertips, inflicted by rodents or other animals, prevented Dr. Presswalla from ascertaining if other similar areas of injury or bruising existed. The internal examination revealed no evidence of any diseased condition. The doctor took swabs of the anal opening, the vagina, and the mouth of the decedent and delivered them to the Forensic Science Laboratory. He also submitted his combings of the victim's pubic and head hair, clippings of her fingernails, and a sample of her blood to the laboratory.

The examiner testified that he found no evidence that the decedent had died from natural causes and that the injuries to the anal area were consistent with the insertion of a foreign object. The medical examiner expressed his opinion that the probable cause of death was asphyxia from manual strangulation. He found that "there was an indentation on the laryngeal cartilage, which is the Adam's apple or voice box." Dr. Presswalla further testified that the victim's hymen was not intact, but he could not determine whether it had been ruptured at or near the time of death because of the body's decomposition.

On November 20, 1979, Lt. Bobby Campbell, the officer in charge of the investigation of the case, released to the newspapers a description of a suspect sought in connection with Sonja's murder. The description was published in one local newspaper, *The Times Herald,* on November 20, 1979, and in another local paper, the *Daily Press,* on November 21, 1979.

Johnny Norton owned Bayberry Amoco Service Station in Newport News. He testified that Keil was working at his station on November 20 and 21, 1979, and that on November 20 the defendant "had long black wavy hair, and a black mustache." Norton read the newspaper articles describing a suspect in the Sonja Dorey murder case and noted that on the afternoon of November 21 the defendant's appearance had been altered in that "he had cut his hair short and shaved his mustache."

The defendant was arrested near his home on November 22, 1979, about 1:15 a.m., after police had observed him acting in a suspicious manner. His dark green, four-door Plymouth automobile was parked in front of his residence. A physical evidence recovery kit, commonly referred to as a "Perk Kit," was obtained from the defendant on November 27, 1979, pursuant to a search warrant.

June E. Browne, a serologist at the Forensic Science Laboratory, was called as an expert witness. She had examined the physi-

cal evidence submitted by the Medical Examiner and the police department and made certain findings. Browne said that Keil's blood type, according to the ABO grouping system, was type O; that in the lesser known NMN system his blood type was NM; and that in the Rh system he was Rh positive. She also said that Keil was a "secretor." She explained the term "secretor" by her testimony that "other body fluids are also typable in the ABO system." She stated that about 80% of the population secrete body fluids (such as seminal fluid, vaginal fluid, tears, ear wax, saliva, and sweat) containing the same "antigen, antibody complex, which allows us to type their blood." That is, a "secretor's" blood type can be determined from other body fluids even in the absence of blood cells from the secretor.

The victim's blood was tested and revealed blood factor O. Browne stated that only the vaginal swabs tested positive for seminal fluid and that the O factor was present in the swabs. She described semen as the liquid carrier of spermatozoa but said no spermatozoa were found. Browne further stated that dried blood found under Sonja's fingernails also contained the O factor. She noted that the hooks on the back of Sonja's brassiere had been torn from the left back and were "hooked into the eyes on the right back."

Browne's analysis revealed that three "questioned" hairs found in Sonja's pubic combings were consistent with one or more of the six hairs taken from Keil. "They were consistent in race, sex, color, diameter, and all the miscroscopic characteristics." She said she could find no inconsistencies and that she could not exclude any of the three hairs on any basis as "they were alike in everything that [she] could measure." Her conclusion was that the "questioned" hairs were consistent with the hair of Keil, "or someone else whose hair had all the same characteristics," a situation which she considered "unlikely." Browne also said that one of four head hairs found on the victim's jeans was consistent in all the characteristics she could measure with a standard head hair sample of Rebecca Keil, the defendant's wife.

■ We find no merit in defendant's assignment of error challenging the jury's conclusion that the murder of the victim occurred during the commission of, or subsequent to a rape. The evidence in this case is wholly inconsistent with murder during consensual intercourse and is consistent with murder during or subsequent to rape.

The victim was a normal, healthy, young girl, who went for a ride with an acquaintance and apparently had every expectation of returning. There is no evidence that she suffered from any disease or died from any natural cause. Her body was found in a remote, isolated, marshy area, lying on its back with legs spread apart. It was completely nude except for socks and two items of clothing which has been pushed up around the victim's neck. One shoe was found away from the body. Her identification card was found in another area. Her underpants were never recovered. Seminal fluid was found within her vagina, indicating that sexual intercourse had occurred. The anal area was bruised to such an extent that the damage was apparent notwithstanding the lapse of time and the decomposition of the body. These findings are all consistent with the jury's determination that a forceful and brutal sexual assault had occurred in which there was not only a penetration of the vagina but also of the anus.

Sonja left home on the afternoon of October 21 in a dark green, four-door sedan. The defendant's automobile answers precisely to this description. An empty Marlboro 100's cigarette package was discovered near the body. Testimony indicated that the defendant customarily smoked that brand. On November 20 Keil's hair was long and wavy, and he wore a mustache. Following publication of the description of a suspect in the case, his hair was cut short and his mustache shaved off. Seminal fluid found in the victim's vagina and blood found under her fingernails were the same blood type as that of the defendant. Significantly, three hairs found in Sonja's pubic area were consistent in every respect with those of Keil. It was "unlikely" that another individual's hair had all the same characteristics. Further, a hair discovered on Sonja's jeans was consistent with head hair samples taken from the defendant's wife. There is no evidence that the victim knew Mrs. Keil, or that this hair became attached to Sonja by any means other than through contact with the defendant or his automobile.

The jury could have concluded from these facts that Sonja had been manually strangled to death while resisting, or after having resisted, a sexual assault by the defendant, and that her body was hidden by him in a secluded area.

The defendant argues that, absent demonstrable physical evidence of force, and absent corroboration of force by testimony, there could be no conviction of capital murder under Code § 18.2-31(e). He contends that, where no evidence establishes that pene-

tration, if it occurred, was accomplished by force, there should be no conviction of murder during the commission of or subsequent to rape.

It is obvious that, where rape is alleged, proof of force is more easily and conveniently established when the victim is able to testify, or when there is a confession by the accused. However, the killing of a victim and the absence of a confession, as in the instant case, do not preclude a finding that force was used to accomplish the intercourse. In both *Justus* v. *Commonwealth,* 220 Va. 971, 266 S.E.2d 87 (1980), and *Waye* v. *Commonwealth,* 219 Va. 683, 251 S.E.2d 202, *cert. denied,* 442 U.S. 924 (1979), the victims were killed, and the defendants never admitted intercourse by force. Yet, in each case convictions were obtained based upon the totality of the facts and circumstances established. In these cases, the victims' nude bodies revealed either gunshot wounds or a brutal assault with a knife. In *Justus,* as in the instant case, seminal fluid of a blood type consistent with that of the defendant was found in the vagina of the decedent. In *Waye* spermatozoa were found in both the vagina and anal cavity, and other evidence of sexual molestation, including injury to the victim's breasts and buttocks, was noted.

Viewing the evidence in the light most favorable to the Commonwealth, and drawing all reasonable inferences therefrom, we conclude that the totality of the facts and circumstances surrounding the murder of Sonja Dorey supports the finding by the jury that her murder occurred during the course of or subsequent to her rape by Keil.

■ The defendant further assigns error to the court's denials of his motions requesting that the jury be polled to determine if any of the jurors had read certain newspaper articles which appeared during the trial. The defendant contends that the trial court abused its discretion in denying the motions and thereby committed reversible error.

On the first day of the trial, March 4, 1980, a Newport News evening newspaper, *The Times Herald,* printed an article concerning the case. The defendant objects to a statement therein that at the preliminary hearing in January 1980, "Sonja's mother testified . . . that her daughter had gone out with a man who called the Dorey home, but whom the mother had never met. She added, however, that the name Walter was familiar." Defendant's counsel, on March 5, made a motion that the jurors be asked if they

had read the news article. The trial judge denied the motion, observing that he did not "see anything wrong with this article," and stated that any questioning of the jurors by the court would only accentuate it.

On March 6, the third day of the trial, defense counsel again moved that the court question the jurors to determine whether they had read an article which appeared that morning in the *Daily Press,* a regional morning newspaper. The defendant objected to two paragraphs in the news article. One paragraph repeated the description of the suspect originally published in *The Times Herald* on November 20, 1979. The March article described the suspect as "having black, wavy hair and a black mustache." The other paragraph reported that "Lt. Bobby Campbell told Judge Henry D. Garnett that Keil had told police that he did not want to give hair and blood samples because they might incriminate him." This statement was not admitted into evidence by the trial court because of a discrepancy in the testimony given by police of the exact content of Keil's statement when he refused to voluntarily give the samples. The trial judge also denied this motion to poll the jurors, stating that in his opinion the article "does no harm to this case." He additionally stated that he would not hesitate to question any juror if there was any evidence that the juror had acted in violation of the court's orders not to read newspapers.

The third article complained of by the defendant appeared in the March 6 *Times Herald.* The news item reported that the defendant was accused of capital murder and sodomy. The article repeated the defendant's refusal to allow hair to be taken for laboratory analysis, and a description of the suspect as having a mustache. The statement that the defendant was accused of capital murder and sodomy was an accurate one. He was indicted for both offenses, and the indictment charging sodomy was not dismissed until after his conviction of capital murder. It was made clear to the jury that defendant was being tried on one indictment only, the one that charged capital murder. The trial judge again refused defendant's motion to poll the jury.

The defendant contends that the articles were prejudicial either because the information given therein had not been introduced in evidence when the articles were published, or because the information was inadmissible as evidence. He argues that the trial court was obligated to poll the jury to ascertain if anyone had

read the articles and to take appropriate action upon the jurors' responses.

We observe that at no time did either the Commonwealth or the defendant request that the jury be sequestered. The trial judge carefully instructed the jurors, admonishing them to refrain from reading any accounts of the trial in the newspapers.*

The trial court, in the exercise of its discretion, determined that the articles complained of by the defendant were not inflammatory or prejudicial and that there was no basis whatsoever upon which to interrogate any juror. The defendant never alleged that any juror had violated the court's orders. In fact, the defendant never claimed or represented to the court that there had been such a violation. Defendant could only speculate or fear that there might have been.

We find no abuse of the court's discretion in denying the motions made by the defendant that the jury be polled. Mrs. Dorey's statement at the preliminary hearing that "the name Walter was familiar" was an innocuous one. Further, the jury heard Mrs. Dorey testify repeatedly at trial that she did not see the defendant and did not know him. With reference to the item which reported that the defendant had refused to voluntarily give hair and blood samples, the record shows that by the time the article appeared there was testimony before the jurors that blood and hair samples had been obtained from the defendant by the use of a search warrant, and they were aware the samples had not been given voluntarily. The jury also heard evidence that the samples obtained had indeed incriminated the defendant. The Attorney General correctly argues that any juror who might have read the articles and remembered the defendant's alleged statement, that the samples would incriminate him, could not have been prejudicially influenced thereby, as the serologist testified to that effect.

---

* "Now, I would admonish you you're not to discuss this matter with anyone, nor allow anyone to discuss it with you, nor will you discuss it among yourselves unless and until you're all together and present in the jury room.

"Now, I'm going to instruct you again not to read any account in the newspapers of any of the proceedings in this Court. There are things that are discussed out of the hearing of the jury, which the newspaper may or may not report, but, in any event, it is not to be considered by you as evidence. I told you many times that you can consider only evidence that you hear in this Courtroom. And by the same token, I don't want you reading any of the articles—any articles which you—you may see and can tell from the headlines it involves this case."

The news items regarding the suspect were not as incriminating as the picture which was properly admitted in evidence, showing that prior to November 21, 1979, defendant had long, wavy, black hair and wore a mustache. And the items were not as incriminating as the testimony given by defendant's employer that on November 20 defendant had long hair and a mustache and that both had been cut by November 21. The second witness for the Commonwealth, the victim's brother, testified that he had noted the unusual hair style of the person his sister left with and described it as a "Fonzie style hair do."

The statement in the articles reciting that defendant had been accused of sodomy could not have been prejudicial. The jury heard ample evidence from which it could have concluded that the defendant not only raped his victim but also committed sodomy. This evidence was properly before the jury to show the force and violence incident to the sexual molestation of the victim by her assailant.

We observe here, as we did in *Thompson v. Commonwealth,* 219 Va. 498, 247 S.E.2d 707 (1978), that the trial court correctly decided that the contents of the news articles were not prejudicial to the defendant. The information contained in the media reports which the defendant finds objectionable had been either properly disclosed to the jury during the trial or was otherwise harmless. Defendant's reliance upon *United States v. Pomponio,* 517 F.2d 460 (4th Cir.), *cert. denied,* 423 U.S. 1015 (1975), and *United States v. Hankish,* 502 F.2d 71 (4th Cir. 1974), is misplaced. In each case "highly prejudicial information" which may have been exposed to the jury was involved. This is not true in the case under review. Further, in *Hankish, supra,* at 77, the court said: "We do not hold that every newspaper article appearing during trial requires such protective measures. Unless there is substantial reason to fear prejudice, the trial judge may decline to question the jurors." Neither does *Aston v. Warden, Powhatan Correctional Center,* 574 F.2d 1169 (4th Cir. 1978), support defendant's position. There, it was alleged that a juror had been exposed to "highly prejudicial" remarks about the defendant.

In the instant case the trial judge was given no reason to suspect that any juror had violated his admonition, and there was no reason from the content of the news articles to fear prejudice. Our decision here is therefore controlled by *Waye v. Commonwealth, supra.* There, counsel for the defendant also moved the trial court

to question the jurors " 'as to what newspaper articles they have read . . . as to the extent of the television exposure that they have had' and 'as to the extent of their discussions with members of the family' and 'other people'." 219 Va. at 701, 251 S.E.2d at 213. The trial court, noting that the jurors had been warned against outside exposure, denied the motion. Upon review we said:

> The defendant argues that, because this was a capital murder case, the trial court should have taken greater precautions to ensure, by questioning the jurors, that there had been "no improper discussion or exposure." But nothing was submitted to the court to indicate that the jurors had been exposed to prejudicial outside influences. Where there is no substantial reason to fear prejudice, a trial court is not required to question jurors concerning their possible exposure to information outside the courtroom. *United States* v. *Hankish,* 502 F.2d 71, 77 (4th Cir. 1974). In the absence of some showing of juror exposure to prejudicial information, it will be presumed that the jury followed instructions to avoid such exposure. *See United States* v. *Pomponio,* 517 F.2d 460, 463 (4th Cir.), *cert. denied,* 423 U.S. 1015 (1975).

219 Va. at 701, 251 S.E.2d at 213.

We find no error in the judgment of the lower court sentencing defendant to life imprisonment for the murder of Sonja Dorey during the commission of or subsequent to her rape.

*Affirmed.*

COMPTON, J., dissenting in part.

I am of opinion that statements in at least one of the press reports were prejudicial to the defendant, and that the majority is wrong when it says "there was no reason from the content of the news articles to fear prejudice." I believe there was substantial reason to fear prejudice.

The *Daily Press* reported on March 6, 1980, that one of the investigators told the trial judge, out of the jury's presence, that the defendant said "he did not want to give hair and blood samples because they might incriminate him." That inculpatory statement was ruled inadmissible by the trial court. Such a revelation in this circumstantial evidence prosecution would have devastated

the defendant's case had it reached one or more jurors. Therefore, I would decide now the issue we did not reach in *Thompson* v. *Commonwealth,* 219 Va. 498, 247 S.E.2d 707 (1978).

I would hold that when, as here, prejudicial publicity is brought to the attention of the court during the course of the trial, the court *must ascertain* if any of the jurors had read the news account. Upon inquiry made to the jury collectively, if none of them had read the publicity in question the judge would be required to proceed no further. If, on the other hand, any of the jurors responded affirmatively, the trial judge should examine those jurors individually and out of the presence of the others to determine the effect of the publicity. *United States* v. *Hankish,* 502 F.2d 71, 77 (4th Cir. 1974). *See State* v. *Williams,* 230 S.E.2d 742, 745-46 (W. Va. 1976).

Because this news coverage was prejudicial, I think the trial court abused its discretion in failing to take the simple step of merely asking the jurors whether they had read the account of the trial appearing in the press on the day in question.

Consequently, I would reverse the conviction in this case.

POFF, J., joins in this dissent.