Richmond

MELVIN THOMPSON

v.

COMMONWEALTH OF VIRGINIA

October 6, 1978.

Record No. 771831.

Present: All the Justices.

*Dean W. Sword, Jr.,* for appellant.

*Robert H. Herring, Jr., Assistant Attorney General (Marshall Cole-man, Attorney General)* on brief) for appellee.

COMPTON, J., delivered the opinion of the Court.

In this criminal appeal dealing with an incident in which a news media report reached the jury during a criminal trial, we will state

at the outset certain principles relating to the issue presented which have not been articulated previously in this context by this court.

First, the influence of newspaper articles or other publicity during a criminal trial may be of such a nature as to deprive a defendant of a fair trial. *State v. Williams,* 230 S.E.2d 742, 745 (W. Va. 1976). Second, jurors serving in a criminal case may not, during the trial, properly read newspaper stories or listen to media reports discussing the proceedings. The basis for this elementary proposition is that a juror's information about the case should come only from the evidence presented at trial and not from any extraneous source. Third, upon a showing that such jurors have read or heard news accounts of the proceedings, the test to be used by the trial court in determining if a mistrial or a new trial should be ordered is whether under the circumstances there has been interference with a fair trial. Annot., 31 A.L.R. 2d 417, 420-21. Fourth, mere reading or hearing news accounts of the trial while it is in progress does not in every case amount to prejudicial misconduct by the jury as a matter of law. *State v. McLaughlin,* 250 Iowa 435, 447, 94 N.W.2d 303, 310 (1959). Some publicity to which jurors have been exposed may be inherently prejudicial while in other cases inquiry will be necessary to ascertain whether the information "may have effectively prejudiced the jury in its deliberation." *State* v. *Williams,* 230 S.E.2d at 745. Fifth, the decision whether such media information brought to the jury's attention results in prejudice to the defendant rests in the sound discretion of the trial court. *Marshall v. United States,* 360 U.S. 310, 312 (1959). See *Asbury v. Commonwealth,* 211 Va. 101, 106, 175 S.E.2d 239, 242 (1970). And, sixth, because there can be no fixed rule which defines what constitutes prejudicial interference with a fair trial, each case must be decided on its special facts. *Marshall v. United States, supra.*

We now turn to the facts of this case. Convicted by a jury of murder in the first degree and of using a firearm in the commission of a felony, defendant Melvin Thompson appeals the September 1977 final order sentencing him in accordance with the verdict to imprisonment for 20 years and one year respectively for the two crimes. While two issues were debated on brief, the parties

addressed only one during oral argument; thus, we will limit our decision to a consideration of that issue.

On May 17, 1977, in the early evening, Billy R. McGlothen was shot and killed while sitting in a small grandstand near a ball field in a recreation area in Portsmouth. The evidence showed that approximately 200 persons were in the general area of the slaying at the time with about 20 to 30 persons standing adjacent to the grandstand. The only eyewitnesses who testified at the trial were two teenage boys who stated that defendant, who was also in the bleachers, shot the victim with a pistol three times from a distance of three feet, after which defendant fled the scene on foot. Defendant denied the crimes and testified he was in another part of the recreation area playing horseshoes when the shooting occurred.

At the close of the first day of trial, after both parties had presented their evidence, the trial court ordered a recess, did not require the jury to be sequestered, and directed the panel to return the following morning. The jurors were instructed not to "be exposed to any form of the news media, radio, TV or newspapers," the court stating that if they noticed any newspaper article to "just put it aside and refrain from reading it until after the case is over." The judge added: "That [instruction] is very important so I hope you all understand that."

The afternoon newspaper for that day circulated in Portsmouth contained the following article with a one-inch high headline:

> "MAN ON TRIAL FOR MURDER
> "IN SHOOTING AT BALL GAME
>
> "PORTSMOUTH—Selection of a jury began today in the trial of Melvin Thompson, 25, charged with murder in a shooting at a softball game.
>
> "The case has attracted attention because police have said that despite the fact that the slaying occurred within sight of 150 spectators and ball players, nearly all the witnesses refused to testify.

"Thompson, of the 200 block of Project Drive, was in the third year of a five-year unsupervised probation for rape when he was charged with the fatal shooting last May 17 of Billy R. McGlothen, 21.

"The shooting occurred at the Cavalier Manor field in Portsmouth.

"Police said it took three days to convince one witness to come forth. Two more later agreed to testify but one of them has since backed out, police said.

"Detectives said they received more than three dozen anonymous calls from witnesses outlining details of the shooting, but the callers refused to testify in court.

"Police said McGlothen and Thompson were near the bleachers at the park waiting for a softball game to start when they got into an argument. The men were not acquainted, said police who were unable to find out the reason for the dispute.

"McGlothen, a native of Detroit stationed on the aircraft carrier Nimitz, was shot in the chest, lower leg and left arm.

"Thompson was arrested near his home about four hours after the 7:10 p.m. shooting.

"He was placed on five years unsupervised probation on Dec. 6, 1974 when he was convicted of a rape in Portsmouth. He has been held on $100,000 bond in the Portsmouth City Jail since his arrest in May."

The record shows that during the morning of the second day of trial, and after the court's instructions had been read to the jury, defendant's attorney stated: "Your Honor, before we start, I believe there's a matter you were going to inquire of the jury." The court responded: "Oh, yes. Ladies and gentlemen of the jury, at this

time I wish to inquire as to whether or not any of you by any chance read either the newspaper article appearing in the Ledger-Star yesterday afternoon or the article appearing in the Virginian-Pilot this morning?" The following colloquy then took place between the trial judge and two jurors:

"JUROR GUYOT: I read the Ledger-Star but it was similar to what I previously read some time ago.

"THE COURT: And the Lady?

"JUROR GUYOT: Has no bearing on my feelings.

"THE COURT: What is your name, sir?

"JUROR GUYOT: Guyot.

"THE COURT: The fact you read last night's article, would that influence your judgment in any way?

"JUROR GUYOT: No, sir, it would not.

"THE COURT: What is the lady's name?

"JUROR KISE: Julia Kise.

"THE COURT: What article did you read?

"JUROR KISE: Last night's Ledger.

"THE COURT: Do you feel that would influence your judgment in any way?

"JUROR KISE: No, sir.

"THE COURT: How did you all happen to read those articles? You remember I admonished you not to read anything, be exposed to any form of the news media whatsoever.

"JUROR KISE: It just had a large heading on it.

"JUROR GUYOT: It was very brief.

"THE COURT: All right, sir."

According to the record, closing argument of counsel immediately followed this exchange, the defendant raising no objection either

to the fact that the jurors had read the article or to the manner in which the trial court's examination of the two persons had been conducted.

Later, while the jury was deliberating, counsel for the defendant moved for a mistrial stating "that two of the jurors have read that newspaper article and I think it contains highly inflammatory and unwarranted conclusions and relates to matters which were not in evidence in the court." Ruling that the article was not prejudicial and that the motion was untimely, the trial court refused to declare a mistrial.

The question to be decided is whether, under the circumstances of this case, the trial court abused its discretion in failing to order the mistrial.

The defendant argues that the jurors engaged in prejudicial misconduct. In addition, the defendant contends that the trial court, in conducting the examination of the jury, should have followed a procedure adopted by the United States Court of Appeals for the Fourth Circuit in *United States* v. *Hankish*, 502 F.2d 71 (1974), and which was embraced by the Supreme Court of West Virginia in *State* v. *Williams*, 230 S.E.2d at 746. The Fourth Circuit, stating that the recommendation on this subject contained in § 3.5(f) of the American Bar Association's Standards Relating to Fair Trial and Free Press "goes too far", requires that:

> "where prejudicial publicity is brought to the court's attention during a trial . . . the court *must ascertain* if any jurors who had been exposed to such publicity had read or heard the same. Such jurors who respond affirmatively must then be examined, individually and outside the presence of the other jurors, to determine the effect of the publicity. However, if no juror indicates, upon inquiry made to the jury collectively, that he has read or heard any of the publicity in question, the judge is not required to proceed further." (Citation omitted.)

502 F.2d at 77.*

Because of the view we take on the main question of prejudice, it becomes unnecessary in this case to set forth a procedure to be followed in a situation where prejudicial publicity is involved. Accordingly, we express no opinion whether trial courts in this Commonwealth, in order to determine the effect of prejudicial publicity, should interrogate jurors individually and outside the presence of other jurors when the court ascertains the jurors have been exposed to such news media reports during a criminal trial.

We turn now to the substantive question of prejudice in this case. Defendant argues that "much of the information" in the news article was not disclosed during the trial. Specifically, he says the news report set forth the following matters about which the jury had not learned from the evidence: "Thompson . . . was in the third year of a five-year unsupervised probation for rape . . ."; "Detectives said they received more than three dozen anonymous calls from witnesses outlining details of the shooting, but the callers refused to testify in court . . ."; and "Police said McGlothen and Thompson were near the bleachers at the park waiting for a softball game to start when they got into an argument." Defendant concludes that this information served to influence the jury against him and denied him a fair trial. We do not agree.

■ We believe the trial court correctly decided that the content of the news article was not prejudicial to the defendant. The information contained in the media report which the defendant finds objectionable had either been disclosed to the jury during the trial or was otherwise harmless new information.

---

* The recommendation of § 3.5 (f) provides:

"Questioning jurors about exposure to potentially prejudicial material in the course of the trial; standard for excusing a juror.

"If it is determined that material disseminated during the trial raises serious questions of possible prejudice, the court may on its own motion or shall on motion of either party question each juror, out of the presence of the others, about his exposure to that material. The method of examination shall be the same as that recommended in section 3.4 (a), above [individual examination out of presence of other jurors]. The standard for excusing a juror who is challenged on the basis of such exposure shall be the same as the standard of acceptability recommended in section 3.4 (b), above, except that a juror who has seen or heard reports of potentially prejudicial material shall be excused if the material in question would furnish grounds for a mistrial if referred to in the trial itself."

The defendant admitted on cross-examination, when being questioned about a prior felony conviction, that he had been found guilty of rape, so the jurors were already aware that defendant was a convicted rapist. They only obtained from the newspaper the additional fact relating to the punishment imposed on defendant for that felony. Manifestly, the fact of unsupervised probation for such a crime could not prejudice such a felon in the eyes of a jury. Moreover, the references in the report to a refusal of many bystanders to testify or even identify themselves to the police was also harmless information. The jury knew from the evidence that many people were in the area when the slaying occurred. In addition, one of the investigating police officers testified: "Nobody at that ball field would talk to us at that time." Only two eyewitnesses testified, and they were minors. It was thus obvious to the jury from these incidents of trial that a number of potential eyewitnesses refused to cooperate with the police and the prosecution. Accordingly, the jury learned no material new facts on that subject from the news article. Likewise, the disclosure that the defendant and the victim were together and that they were engaged in an argument was innocuous. Testimony of the eyewitnesses placed the two men together at the time of the shooting. And the fact that an argument may have been in progress did not bear on the culpability of the defendant to his prejudice since he asserted an alibi defense. In summary, we cannot say that the jurors' misconduct interfered with a fair trial.

Consequently, the judgment of conviction will be

*Affirmed.*

## RULES OF COURT
### Order Amending

*VIRGINIA:*

*In the Supreme Court of Virginia held at the Supreme Court Building in the City of Richmond on Friday the 22nd day of September, 1978.*

Heretofore came the Virginia State Bar, by William T. Prince, its President, and presented to the Court a petition approved by the Council of the Virginia State Bar, praying that Paragraph 14, Section IV of the Rules for Integration of the Virginia State Bar, Relating to Law Corporations, be amended to read as follows:

(c) *Application for Certificates.* A Certificate of Registration as a law corporation shall be issued if the application shows that:

(i) The applicant is organized under the provisions of Chapter 7 of Title 13.1 of the Code of Virginia (the Virginia Professional Corporation Act), or organized under the provisions of Chapter 25 of Title 54 of the Code of Virginia (the Virginia Professional Association Act), or organized under the laws of a jurisdiction other than the Commonwealth of Virginia to perform a professional service of the type defined in Section 13.1-543 (1) of the Code of Virginia.

(ii) All of the applicant's shareholders (associates), directors and officers, and their names and addresses are set forth in full in the application.

(iii) Each employee or agent of applicant who will practice law in Virginia (the name and address of whom are set forth in full in the application), whether or not a director, officer or shareholder (associate) of the applicant is a member of the Virginia State Bar and duly licensed to practice law in Virginia. Nothing in this paragraph (iii) shall be deemed to prohibit a non-licensed individual from serving as secretary, treasurer, office manager or business manager of any law corporation; provided, however, that such individual shall not be held out to be qualified or otherwise authorized to practice law or give advice on a legal or related matter to the clients of the law corporation. Any employee or agent of applicant who is duly licensed to practice law in Virginia

and who is not held out to the public to be so authorized shall be deemed for the purposes of these rules to be a non-licensed individual.

Upon consideration whereof, it is ordered that the Rules for Integration of the Virginia State Bar, Relating to Law Corporations, be, and the same are hereby, amended in accordance with the prayer of the petition aforesaid, effective immediately.

A Copy,

Teste:

Allen L. Lucy

Clerk