# COURT OF APPEALS OF VIRGINIA

### Record No. 0170-25-4

DORIAN OMAR CHAVARRIA

v.

COMMONWEALTH OF VIRGINIA

Present: Judges Beales, Raphael and Bernhard

Argued at Arlington, Virginia

Opinion Issued April 7, 2026

## FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
James A. Willett, Judge

Brett P. Blobaum, Senior Appellate Attorney (Virginia Indigent Defense Commission, on briefs), for appellant.

Lindsay M. Brooker, Assistant Attorney General (Jason S. Miyares,[1] Attorney General, on brief), for appellee.

## PUBLISHED OPINION BY
## <u>JUDGE DAVID BERNHARD</u>

Dorian Omar Chavarria appeals the final sentencing order of the Circuit Court of Prince William County. Chavarria argues that the imposition of multiple sentences under Code §§ 18.2-67.2 (object sexual penetration) and 18.2-67.3 (aggravated sexual battery) for the same conduct violates the Double Jeopardy Clause. He contends it is clear from the statutory language and legislative history that the General Assembly did not intend to authorize multiple punishments for object sexual penetration and aggravated sexual battery arising from the same conduct. These contentions constitute his first two assignments of error, one for each incident. In his third assignment of error, Chavarria argues the trial court erred in denying his motions to strike and the

---

[1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

motions to set aside the verdict on the two counts of aggravated sexual battery, asserting that aggravated sexual battery is a lesser-included offense of object sexual penetration and that the evidence was insufficient to support those convictions separately from the penetration offenses. In his fourth assignment of error, Chavarria argues the trial court erred in failing to grant a mistrial or set aside the verdict, and in failing to question excused alternate juror Ms. Fairfax, based on a private conversation she had with a deliberating juror in the courthouse lunchroom after closing arguments.

This Court finds the trial court did not err in imposing separate punishments under Code §§ 18.2-67.2 and 18.2-67.3 for the same conduct, nor did it err in denying the motion to strike or to set aside the verdicts on the aggravated sexual battery charges.

When a defendant raises a double-jeopardy claim premised on multiple punishments, this Court must first examine whether the statutory text or legislative history unambiguously establishes the General Assembly's intent to authorize, or prohibit, cumulative punishment. Where the legislature has expressed a clear intent to impose multiple punishments, that expression is dispositive and application of the analysis in *Blockburger v. United States*, 284 U.S. 299 (1932), is unnecessary. Here, however, the relevant statutory provisions, while not ambiguous, are silent as to whether separate punishments are authorized for conduct that implicates both offenses. Accordingly, legislative intent must be ascertained by resorting to the *Blockburger* test.

Under *Blockburger*, two offenses arising from the same act or transaction are not the "same offense" for double-jeopardy purposes if each statutory provision requires proof of a fact that the other does not. Object sexual penetration under Code § 18.2-67.2 requires proof of penetration of the labia majora or anus with an animate or inanimate object, an element not required by aggravated sexual battery under Code § 18.2-67.3. Conversely, aggravated sexual battery requires proof of "sexual abuse," as defined in Code § 18.2-67.10(6), demanding a specific intent to sexually molest,

arouse, or gratify—an element not required to prove object sexual penetration, a general-intent offense requiring only the voluntary commission of the prohibited act. Because each offense contains an element the other does not, the *Blockburger* test is satisfied, and the General Assembly is presumed to have authorized separate punishments. Turning to Chavarria's third assignment of error, the evidence was sufficient to support the convictions for aggravated sexual battery independent of the penetration offenses, as the act of anal penetration necessarily encompasses the touching of an intimate part and the jury could permissibly infer the specific intent to molest, arouse, or gratify from the nature and circumstances of the conduct.

As to Chavarria's fourth assignment of error, although Chavarria alluded to possible juror misconduct after closing arguments, he neither moved for a mistrial nor requested that the trial court examine the excused juror at the time of the alleged error. Rule 5A:18 of the Rules of the Supreme Court of Virginia requires that an objection be stated with reasonable certainty at the time of the ruling; a general or abstract reference to a concerning circumstance does not satisfy this requirement. Because Chavarria failed to present the issue to the trial court with the requisite specificity, the claim is procedurally defaulted, and the trial court was not obligated to act sua sponte.

Consequently, for the reasons aforesaid and further detailed below, the judgment of the circuit court is affirmed.

## BACKGROUND

On September 6, 2022, a grand jury indicted Chavarria on two counts alleging aggravated sexual battery in violation of Code § 18.2-67.3 and two counts alleging object sexual penetration

in violation of Code § 18.2-67.2.[2]  These charges related to two separate incidents occurring at different residences in Manassas, Virginia, where D.M. and his family lived.[3]

D.M. was 17 years old at the time of trial.  During the trial, D.M. lived with his mother, Ingrid Figueroa, and his younger sister, N.F.  D.M. has two older siblings, Marjorie/Mallurie[4] (age 24 at the time of trial), and Dorian Chavarria ("Chavarria"), who is about 10 years older than D.M.

---

[2] Chavarria was also tried for the crime of forcible sodomy.  However, after denying Chavarria's second motion to strike, the circuit court ordered the Commonwealth to elect between the forcible sodomy and one of the object sexual penetration charges to go to the jury. The Commonwealth chose to proceed to the jury on the object sexual penetration charge, and the circuit court acquitted Chavarria on the forcible sodomy charge.

[3] One of the aggravated sexual battery and one of the object sexual penetration indictments accused Chavarria of committing those crimes between January 1, 2011 and October 1, 2014.  The other two indictments accused Chavarria of committing those two crimes between October 1, 2014 and December 31, 2016.  There is some discrepancy in the timing of when the family lived in each of the residences, given that D.M. was born in 2006.  D.M. testified he believed he was around six or seven years old when he lived on Byrd Street and that he believed he was eight or nine years old when the family moved to Taney Lane.  Mallurie, D.M.'s older sister, testified that the family lived on Byrd Street in 2009 and 2010, which would have made D.M. around three or four years old.  She also testified that the family lived on Taney Lane in 2012 until 2014, which would have made D.M. around six to eight years old.  Defense counsel did raise this issue in the motion to set aside the verdict with respect to the jury's question about whether the Commonwealth had to prove that the offenses occurred within the date ranges; however, Chavarria did not appeal the trial court's instruction to the jury that "the date range is not an element of the offense," and thus the Commonwealth need not prove the date ranges.

[4] During the trial, D.M.'s older sister was called both "Mallurie" and "Marjorie."  During his testimony, D.M. stated, "I refer to her as Marjorie," even though her legal name is Mallurie. In this opinion, D.M.'s older sister is referred to as Mallurie.

*I. The Byrd Street[5] Incident*

When D.M. was around six or seven years old, he was living in a townhouse on Byrd Street with his mother, Mallurie, and Chavarria. The four of them slept in the master bedroom.[6] There were two beds in the master bedroom. D.M. and Chavarria shared the twin size bed that was against the wall, and his mother and Mallurie shared the king bed.

D.M. testified that on one occasion while living on Byrd Street, he was alone with Chavarria in the master bedroom during the day lying on the twin bed. The bedroom door was closed. D.M. testified, "I was laying on my side and I was facing towards the wall. And [Chavarria] was on the other side closer to the edge of the bed and he was sitting up." Chavarria took D.M.'s clothes off of D.M. He further testified, "[w]hen I was laying down in the bed, I was—I didn't have any clothes on, but I do remember the clothes that I had on. I was laying next to Dorian. And when I was, I can remember him putting his penis inside of me." He continued, "I don't remember how it got to the point. I just remember what happened as it was happening." When asked for further details about the incident, D.M. responded,

> I remember laying down and he was laying down next to me. He
> just had his pants, like, unbuckled, and I remember I felt pain in
> my butt area. And then I just felt the blanket get thrown over me
> and I peeked over the blanket and Marjorie had came into the room
> and she asked if we wanted anything to eat.

On direct examination, when D.M. was asked whether he knew what the pain in his buttocks area was, D.M. responded, "I wouldn't be able to answer that." D.M. stated he felt something "[i]nside the butt area" and that he initially indicated it was Chavarria's penis

---

[5] Throughout the trial, witnesses and counsel used different street suffixes when referring to the Byrd residence (e.g., Byrd Street, Byrd Drive). This opinion refers to this residence as either "the Byrd residence" or as the residence located on "Byrd Street."

[6] There were three bedrooms in the townhouse, but D.M.'s mother rented the other two bedrooms out.

"[b]ecause it couldn't have been a finger." He added, "[y]ou can tell the difference, when you're a guy, the difference between your hand and your actual penis. And it didn't feel like that." D.M. further stated that "[i]t felt like I had been cut. I'm not saying that I did get cut."

On cross examination, D.M. was asked whether he meant "between [his] cheeks or . . . inside [his] anal cavity" when he said he felt Chavarria's penis inside of him. D.M. responded, "[b]etween my cheeks." He then clarified that he had not understood the earlier question and that, in both incidents, Chavarria put his penis "[i]nside the hole." Additionally, D.M. testified that the penetration felt "like a ripping cut." D.M. testified that there was no touching prior to the penetration other than Chavarria pulling down D.M.'s pants.

Redacted portions of D.M.'s preliminary hearing testimony were admitted as Defense Exhibit 4.[7] During the preliminary hearing, D.M. testified that Chavarria had touched D.M.'s buttocks with his hand and that Chavarria's "fingers were touching where at the part where [D.M.'s] anal is." On cross examination, defense counsel asked, "So today you testified that on Byrd, [Chavarria] just put his penis inside you?" D.M. responded affirmatively. When asked, "And that there was no touching leading up to it?," D.M. stated, "No." Defense counsel later asked, "So again, looking at the preliminary hearing testimony, you testified previously that during the Byrd incident, his fingers were the thing touching you?" D.M. replied, "His fingers and his penis." Then, defense counsel asked, "And his penis?," to which D.M. said, "Yes."

_____

[7] The jury was instructed as follows:

> If you believe from the evidence that a witness other than the
> defendant previously made a statement inconsistent with his or her
> testimony at this trial, the only purpose for which that statement
> may be considered by you is its bearing on the witness's
> credibility. It is not evidence that what the witness previously said
> is true.

On redirect examination, D.M. explained that the abuse during the incident on Byrd Street was slightly different than the abuse during the Taney Lane incident. D.M. testified that, during the Byrd Street incident, Chavarria "used his hands to grab [D.M.]" "[t]o . . . hold [him]." D.M. could not recall whether "any other part of [Chavarria's] body, other than his penis, came in contact with [D.M.'s] butt."

Finally, D.M. testified that no liquid or lubricant was used, that he did not cry or scream during or after the Byrd Street incident, and that he did not recall Chavarria saying anything during the incident and did not observe "anything else . . . that made him concerned." He testified that this incident was the only time Chavarria made him feel uncomfortable while they were living on Byrd Street.

## II. The Taney Lane[8] Incident

According to D.M., he moved into a townhouse on Taney Lane when he was eight or nine years old with his mother, Chavarria, and Mallurie. At the time of the move, D.M.'s mother was pregnant with D.M.'s younger sister, N.F., and when she was born, N.F. lived with D.M.'s family at the townhouse. D.M., his mother, and his sisters shared one room, and Chavarria slept in his own room.

D.M. testified that he was home one day during the summer "sitting on the couch on the far left side towards the corner" and was facing the TV. Chavarria "came to sit down and he sat down on the floor [o]n this right side." At the time, no one else was home. D.M. continued, "[w]hen I was sitting on the couch, [Chavarria] sat closer to me. And when he did, I got up and I laid down on the floor. And when I did, [Chavarria] got up and also laid down on the floor." D.M. "was laying flat on the floor on [his] stomach." When asked, "[w]hat happened next?,"

---

[8] Throughout the trial, counsel and witnesses used different street suffixes when referring to the Taney residence (e.g., Taney Road, Taney Lane). This opinion refers to the residence as either "the Taney residence" or as the residence located on "Taney Lane."

D.M. responded, "[Chavarria] got on top of me . . . [a]nd he pulled my pants down and he pulled out his penis and unbuckled his pants and he put his penis in me." When asked to clarify what he meant when he said Chavarria had put his penis inside of him, D.M. stated, "[i]nside of my butt." On cross examination, D.M. was asked whether he meant "between [his] cheeks or . . . inside [his] anal cavity?" D.M. responded by asking, "What do you mean by anal cavity?" Defense counsel clarified, "[l]ike inside the hole or just between the cheeks?" D.M. replied, "[i]nside the hole."

Chavarria laughed when D.M. "told him to get off [D.M.] because it hurt and . . . [Chavarria] was heavy." Right after the incident, D.M. "got up," sat in a chair, and cried. When D.M. told Chavarria "it hurt," Chavarria "laughed again." D.M. did not recall whether Chavarria made any other comments or said anything else. After, D.M. "continued to watch TV and [Chavarria] buckled his pants and he sat back down." Chavarria later left the townhouse, and D.M. was alone at home for a couple of hours. D.M. testified he used "the bathroom later on after, . . . and when I did, I just saw a bunch of blood in the toilet. And my butt really burned." D.M. did not recall any other incidents where Chavarria made D.M. uncomfortable while they were living on Taney Lane.

### III. The Motion to Strike

At the close of the Commonwealth's case, defense counsel moved to strike the charges, arguing that "it is very clear that there is only two incidents that have been alleged" and that "we're running into double jeopardy or double punishment issues, where essentially that the singular act is being charged as a wide variety of different crimes." When the circuit court asked the Commonwealth how many convictions it thought the evidence supported, the Commonwealth responded,

> Judge, I would submit that I believe the convictions that would be
> supported are, at least, two convictions for each incident. I would

> submit to the Court that, again, an aggravated sexual battery is the act that occurs until penetration is accomplished.
>
> And so I do think, through one act, an individual can be convicted of an aggravated sexual battery and a penetrative crime.

The circuit court denied the motion to strike, noting D.M.'s testimony about where Chavarria placed his penis and D.M.'s testimony clarifying that Chavarria did not penetrate him with his fingers but did use his hands around D.M.'s buttocks area.

After the defense presented its evidence, defense counsel renewed the motion to strike. The defense incorporated the earlier motion to strike but also raised some additional information and evidence. Specifically, defense counsel argued D.M. only testified to anal penetration and did not testify to a separate incidental contact giving rise to the aggravated sexual battery charges. The Commonwealth argued that the evidence was sufficient to support the two counts of aggravated sexual battery because "you cannot touch the inside of the anus without also touching the outside of the anus." The Commonwealth further asserted that "an aggravated sexual battery is accomplished by the perpetrator's genitalia touching the intimate parts of the victim, and then an object sexual . . . penetration . . . is accomplished by the penetration."

The court denied the motion to strike the aggravated sexual battery and object sexual penetration charges, explaining:

> With respect to the aggravated sexual battery, the physics of it, I think, justify denying the motion to strike. With respect to the Byrd address incident, with respect to the Taney Road address incident, there was evidence of touching the buttocks with hands, in addition to touching it with the penis.

*IV. Alleged Juror Misconduct*

Following closing arguments, the circuit court excused the two alternate jurors, Ms. Fairfax and Ms. McMahan.[9]  At 11:59 a.m. on May 9, 2024, the jury retired to begin deliberations, and the court recessed.  Shortly after 2:00 p.m., the circuit court came back on the record.  Chavarria's counsel proffered that other members of the Public Defender's Office had seen Ms. Fairfax in the lunchroom.  On her way down to the lunchroom, Ms. Fairfax spoke with some members of the Office but then "proceeded to speak with, at least, one other juror."  "[S]he was expressing disappointment and talking about how many notes and things she had taken.  And then there was some additional conversation, some two to three minutes, that was too low for anyone to overhear."  Counsel noted that "the alternates were not instructed not to discuss this further.  Obviously our jurors know that pretty well at this point, but it's yet another issue that I felt like needed to be raised and put on the record."  Counsel also noted that it was unclear whether the empaneled juror "really engaged" but that "Ms. Fairfax was clearly expressing some opinions and mentioned her notes."  Chavarria's counsel and the circuit court then had the following conversation:

> The Court: You've got to be a little more specific than that, Mr. Stout.  I mean, you know.
>
> Mr. Stout: Well, to the extent she's talking about the notes she took in trial and she's expressing --
>
> The Court: Well --
>
> Mr. Stout: -- opinions to an active juror --
>
> The Court: Well, I need to know what they are.  I can't -- You know --
>
> Mr. Stout: That's the thing; I don't know.

---

[9] After voir dire, the clerk randomly selected two names from an envelope to be the alternate jurors.

The Court: Okay.  Well, I'm not going to do anything, unless you can tell me what the -- The fact that somebody told you that they heard an alternate juror expressing opinions isn't sufficient for me to act on.

Mr. Stout: All right.  Well, Ms. Hasanzadah is actually present.  She's the one who overheard this.  She was just sitting at lunch.

The Court: Well, you need to talk with her and present that to the Court.  Expressing opinions, "I've got a lot of notes," "I'm disappointed I didn't get to serve," none of that is of any significance.

Mr. Stout: That's the extent of my proffer.  I think it's, you know, it is a problem.  I don't know that there's a solution, again, without interrogating, honestly, Ms. Fairfax.  But, that's the --

The Court: I'm not going to do that at this juncture, based on that representation.  If there's something more specific, like, "I thought he was guilty," or, you know, anything along those lines --

Mr. Stout: That's all we heard.

The Court: Okay.  How do you know opinions were expressed if you didn't hear --

Mr. Stout: Well, opinions about -- What was overheard, opinion-wise, was opinions about being removed, right, about being an alternate is all that was actually heard.

The Court: Oh, so not about the case?

Mr. Stout: No, no one actually directly heard.  And then she started talking about her notes and then --

. . . .

All of the information we have really in a vacuum, without knowing the rest of the conversation, we know they exchanged numbers and things, but, again, that's what I have.  I just wanted to --

The Court: Okay.

Mr. Stout: -- put that on the record.

After this exchange, defense counsel did not specifically state he was asking the court to take a specific action, nor did he state any objection to the trial court's decision not to interrogate the alternate juror.

### V. Conviction, Motion to Set Aside, and Sentencing

On May 10, 2024, the jury convicted Chavarria of the four charges.[10]  Before sentencing, Chavarria filed a motion to set aside the verdict.  He again argued that, under the double jeopardy protections, he cannot be convicted of both object sexual penetration and aggravated sexual battery for the singular act of anal penetration, as D.M. did not testify that Chavarria touched D.M.'s buttocks area or any other intimate part of his body during either incident.  Chavarria also argued "[t]he [c]ourt should have granted a mistrial or at minimum conducted further investigation into the second instance of improper [juror] communication."  The trial court denied the motion and stated the following:

> Double jeopardy, I do not think applies, because object sexual penetration and aggravated sexual battery each contain an element that the other does not.  They are not lesser included offenses of one another either way.

With respect to the juror misconduct, the court stated, "the information that we had about that was very limited, and we were all pretty much speculating as to what impact, if any, that would have."  The court further stated, "[a]s such, the burden to establish that it impugned the validity of the verdict simply was not met."

---

[10] The record does include the jury verdicts but not the transcript of the final day of trial, which involved the jury returning its verdict.  In Chavarria's motion to set aside the verdict, he noted, "[d]ue to a technical failure, there is no transcript or recording of the proceedings on May 10, 2024."  In the motion, Chavarria proposed a statement of facts for the proceedings on May 10, 2024.  It does not appear the circuit court adopted the proposed statement of facts.

The circuit court sentenced Chavarria to 60 years of incarceration with 47 years suspended, for a total active sentence of 13 years. The sentencing order was entered on January 29, 2025.

ANALYSIS

*I. Whether Multiple Punishments Under Code §§ 18.2-67.2 and 18.2-67.3 for the Same Conduct Violates the Double Jeopardy Clause*

Chavarria's first assignment of error concerns the Byrd Street incident, and the second concerns the Taney Lane incident; however, because the two assignments of error involve the same substantive issue, they are addressed together. Chavarria asserts that the sentences for one count of object sexual penetration and one count of aggravated sexual battery for each of the incidents violated the Double Jeopardy Clause of the Fifth Amendment. Specifically, Chavarria argues it is clear from the statutory language and legislative histories of Code §§ 18.2-67.2 and 18.2-67.3 that the General Assembly did not intend to authorize multiple punishments under these statutes for the same act. Chavarria also argues that if legislative intent is unclear from the statutes themselves, multiple punishments under these statutes are still prohibited because aggravated sexual battery is a lesser-included offense of object sexual penetration under the *Blockburger* test.

"In reviewing a double jeopardy claim, or a claim based on statutory interpretation, this Court shall conduct a de novo review." *Davis v. Commonwealth*, 57 Va. App. 446, 455 (2011) (italics omitted). Under the Fifth Amendment, no "person [shall] be subject for the same offen[s]e to be twice put in jeopardy of life or limb." U.S. Const. amend. V. "[T]he Double Jeopardy Clause 'protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the offense after conviction. And it protects against multiple punishments for the same offense.'" *Albernaz v. United States*, 450 U.S. 333, 343 (1981) (quoting *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969)). The instant case involves the third protection, as Chavarria's convictions and sentencing occurred in a single trial. "In the single-trial setting, 'the

- 13 -

role of the constitutional guarantee is limited to assuring that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense.'" *Andrews v. Commonwealth*, 280 Va. 231, 279 (2010) (quoting *Blythe v. Commonwealth*, 222 Va. 722, 725 (1981)).

"[T]he question whether punishments imposed by a court after a defendant's conviction upon criminal charges are unconstitutionally multiple cannot be resolved without determining what punishments the Legislative Branch has authorized." *Blythe*, 222 Va. at 725 (quoting *Whalen v. United States*, 445 U.S. 684, 688 (1980)). "[T]he analysis of whether multiple punishments are authorized by legislative act" begins with "consider[ing] whether 'the legislative intent is clear from the face of the statute or the legislative history.'" *Andrews*, 280 Va. at 283-84 (quoting *Garrett v. United States*, 471 U.S. 773, 779 (1985)); *see also Commonwealth v. Gregg*, 295 Va. 293, 298 (2018) ("When considering multiple punishments for a single transaction, the controlling factor is legislative intent." (quoting *Kelsoe v. Commonwealth*, 226 Va. 197, 199 (1983))).

If the plain language of the statute or the legislative history is clear on the issue of legislative intent, then the *Blockburger* rule does not control. *See Andrews*, 280 Va. at 284 ("[W]hile *Blockburger* can provide an efficient mechanism to parse statutory language in order to determine the legislature's intent with regard to whether multiple punishments are permitted for conduct chargeable under more than one code section, it is not the sole, or in many cases, the primary tool of statutory construction used to determine that intent. . . . '[I]t would be difficult to contend otherwise without converting what is essentially a factual inquiry as to legislative intent into a conclusive presumption of law' that any differentiation in the language defining the elements of an offense would authorize multiple punishments for otherwise undifferentiated conduct." (quoting *Garrett*, 471 U.S. at 779)); *Brown v. Commonwealth*, 230 Va. 310, 313 (1985) ("The Supreme Court has decided that this [*Blockburger*] test need not be applied when the intent of the legislature can be

gleaned from a reading of the relevant statutes."). If, however, the statute or legislative history is silent or vague, then the *Blockburger* rule provides the legislative intent. *See Albernaz*, 450 U.S. at 341-42 ("[I]f anything is to be assumed from the congressional silence on this point, it is that Congress was aware of the *Blockburger* rule and legislated with it in mind."); *Andrews*, 280 Va. at 286 ("In ascertaining legislative intent, we presume that the General Assembly, when enacting new laws, is fully aware of the state of existing law relating to the same general subject matter." (quoting *Gillespie v. Commonwealth*, 272 Va. 753, 758 (2006))); *Washington v. Commonwealth*, 46 Va. App. 276, 281-82 (2005) ("The General Assembly is presumed to be aware of the decisions of this Court when enacting legislation." (quoting *Waterman v. Halverson*, 261 Va. 203, 207 (2001))).

Under *Blockburger*, 284 U.S. at 304, "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." When applying the *Blockburger* test, this Court "look[s] at the offenses charged in the abstract, without referring to the particular facts of the case under review." *Coleman v. Commonwealth*, 261 Va. 196, 200 (2001); *see also Sanchez v. Commonwealth*, 32 Va. App. 238, 241 (2000). The assumption of the *Blockburger* test "is that [the legislature] ordinarily does not intend to punish the same offense under two different statutes." *Whalen*, 445 U.S. at 691-92. "The very presence of dissimilar elements within two statutory offenses, [however,] provides 'a clear indication of contrary legislative intent.'" *Gregg*, 295 Va. at 298 (quoting *Whalen*, 445 at 692). If, under the *Blockburger* test, the two statutory provisions constitute one offense, e.g., one provision is a lesser-included offense of the other, then "conviction and punishment for both offends" the Double Jeopardy Clause. *Rea v. Commonwealth*, 14 Va. App. 940, 945 (1992). In those circumstances, "[t]he conviction of the lesser included crime is subsumed in the greater conviction." *Id.*

- 15 -

The statutory language and the legislative history of Code §§ 18.2-67.2 and 18.2-67.3 do not provide an express or implicit prohibition nor authorization of multiple punishments for the same conduct. Neither statute states that if a defendant's conduct violates both statutes then punishment can only be had for one of those statutory provisions. Chavarria appears to argue the legislative history of Article 7 of Title § 18.2, of which Code §§ 18.2-67.2 and 18.2-67.3 are a part, demonstrates the General Assembly intended to create graduated sentencing such that offenders who violated multiple statutes through the same conduct were to be punished only under the statute that allows the most severe punishment. Such an interpretation, however, is not supported. Nowhere in the statutory provisions or legislative history does the General Assembly indicate such an intent, and the mere fact that many of the statutes in Article 7 were enacted or amended at the same time does not evince a general intent to only allow punishment under the statute that provides for the most severe punishment.

Additionally, Chavarria's interpretation is further undercut by the fact that the General Assembly has not elected to disturb caselaw allowing multiple punishments for statutes included in Article 7. *See Bowden v. Commonwealth*, 52 Va. App. 673, 676-78 (2008) (holding that aggravated sexual battery is not a lesser-included offense of forcible sodomy because each offense contains an element the other does not); *Ragsdale v. Commonwealth*, 38 Va. App. 421, 428-29 (2002) (holding that carnal knowledge is not a lesser-included offense of rape). In *Bowden*, 52 Va. App. at 676-78, this Court applied the same abstract-elements test to two Article 7 offenses sharing overlapping facts and yet found them constitutionally distinct for double jeopardy purposes, precisely the result Chavarria urges this Court to reject here. That the General Assembly has enacted and amended Article 7 statutes multiple times since *Bowden* without adding any prohibition on simultaneous punishment is strong evidence that the legislature approves of that result. *See Andrews*, 280 Va. at 286. Because the statutory language

- 16 -

and legislative history are silent on whether the General Assembly intended to authorize multiple punishments under Code §§ 18.2-67.2 and 18.2-67.3 based on the same conduct, the *Blockburger* rule must be applied.

Under *Blockburger*, aggravated sexual battery is not a lesser-included offense because each statutory provision requires proof of an element the other does not. As it pertains to this case, Code § 18.2-67.2 states, "[a]n accused shall be guilty of inanimate or animate object sexual penetration if he or she penetrates the labia majora or anus of a complaining witness, . . . other than for a bona fide medical purpose, . . . with an object . . . , and . . . [t]he complaining witness is less than 13 years of age." Code § 18.2-67.2(A)(1). Code § 18.2-67.3 states, "[a]n accused is guilty of aggravated sexual battery if he or she sexually abuses the complaining witness, and . . . [t]he complaining witness is less than 13 years of age." Code § 18.2-67.3(A)(1). "'Sexual abuse' means an act committed with the intent to sexually molest, arouse, or gratify any person, where . . . [t]he accused intentionally touches the complaining witness's intimate parts or material directly covering such intimate parts." Code § 18.2-67.10(6)(a). "'Intimate parts' means the genitalia, anus, groin, breast, or buttocks of any person, or the chest of a child under the age of 15." Code § 18.2-67.10(2).

As these provisions make clear, the General Assembly defined "sexual abuse" as a separate, express element that applies when an offense incorporates § 18.2-67.10(6) by reference, such as aggravated sexual battery under Code § 18.2-67.3, but it did not cross-reference that definition in Code § 18.2-67.2. The object sexual penetration statute instead focuses on whether the accused penetrated the labia majora or anus with an object, other than for a bona fide medical purpose, under the specified circumstances, without requiring an "intent to sexually molest, arouse, or gratify any person."

Object sexual penetration requires proof of penetration with an object and not merely touching. *See Calokoh v. Commonwealth*, 76 Va. App. 717, 731-32 (2023); *Herrel v. Commonwealth*, 28 Va. App. 579, 585 (1998). By contrast, aggravated sexual battery requires proof that the touching of an intimate part was done with the specific "intent to sexually molest, arouse or gratify" a person. *Bowden*, 52 Va. App. at 678 (quoting *Quinones v. Commonwealth*, 35 Va. App. 634, 640 (2001)); *see also De'Armond v. Commonwealth*, 51 Va. App. 26, 33 (2007). Object sexual penetration, on the other hand, is a general-intent crime completed upon the voluntary commission of the prohibited penetration under the requisite circumstances, without any additional mental-state element beyond the general intent evidenced by the act itself. *See Calokoh*, 76 Va. App. at 733 (holding that like rape, object sexual penetration requires proof of "the general intent evidenced by the act of committing the offense itself" (quoting *Gonzales v. Commonwealth*, 45 Va. App. 375, 382 (2005) (en banc))). Thus, aggravated sexual battery contains a specific-intent element that object sexual penetration does not, while object sexual penetration contains a penetration element that aggravated sexual battery does not.

Chavarria argues that Code § 18.2-67.10's definition of sexual abuse is not an element of aggravated sexual battery. Chavarria alternatively contends that even if Code § 18.2-67.3 contains a specific-intent element through its incorporation of "sexual abuse," that intent is inherent in any violation of Code § 18.2-67.2. This argument conflates the ordinary-language sense of "sexual abuse" with the General Assembly's defined term. The legislature chose to require proof of "an act committed with the intent to sexually molest, arouse, or gratify any person" only where a statute expressly incorporates the definition of "sexual abuse" in Code § 18.2-67.10(6). Code § 18.2-67.3 does so; Code § 18.2-67.2 does not. Because § 18.2-67.2 can be violated whenever an accused accomplishes non-medical object penetration of the labia majora or anus under the listed circumstances, without any additional mental-state element

- 18 -

beyond the general intent evidenced by the act itself, a conviction under that statute does not necessarily establish the specific intent required for aggravated sexual battery. Treating "sexual abuse" as inherent in object sexual penetration would effectively rewrite § 18.2-67.2 to include an element the General Assembly omitted.

Chavarria additionally argues in his reply brief that Code § 8.01-249(6) explicitly shows the General Assembly's intent to mandate that the definition of "sexual abuse" includes object sexual penetration. The accrual statute states, "As used in this subdivision, 'sexual abuse' means sexual abuse as defined in subdivision 6 of § 18.2-67.10 and acts constituting rape, sodomy, object sexual penetration or sexual battery as defined in Article 7 (§ 18.2-61 et seq.) of Chapter 4 of Title 18.2." Code § 8.01-249(6). Contrary to Chavarria's argument, this statute is not imposing Code § 18.2-67.10's definition of sexual abuse onto Code § 18.2-67.2. Code § 8.01-249(6) explicitly categorizes object sexual penetration as sexual abuse only for purposes of the accrual statute by using the phrase "[a]s used in this subdivision."

The question is not whether the facts of a given case may suggest a sexual motive, but whether the statutory elements themselves require proof of the specific "sexual abuse" intent. Because aggravated sexual battery and object sexual penetration each require proof of an element that the other does not, the two offenses are not the same for purposes of the Double Jeopardy Clause. Thus, the General Assembly is presumed to have authorized multiple punishments under these statutes for the same conduct, absent clear legislative intent to the contrary.

II. *Whether Aggravated Sexual Battery Is a Lesser-Included Offense of Object Sexual Penetration and Whether the Evidence Was Sufficient*

In the third assignment of error, Chavarria asserts the trial court erred in denying the motion to strike and the motions to set aside the verdict on the two counts of aggravated sexual battery. According to Chavarria, aggravated sexual battery is a lesser-included offense of object sexual

- 19 -

penetration. The Commonwealth responds that, under *Blockburger*, aggravated sexual battery is not a lesser-included offense, and thus, multiple punishments can be imposed without violating the Double Jeopardy Clause. As discussed above, aggravated sexual battery is not a lesser-included offense of object sexual penetration because each statutory provision requires proof of a fact the other does not.

Chavarria further argues that the evidence from each incident only establishes one act each and thus is insufficient to support the convictions for aggravated sexual battery. The Commonwealth responds that even if aggravated sexual battery is a lesser-included offense of object sexual penetration, the evidence sufficiently supported the convictions for aggravated sexual battery apart from the object sexual penetration convictions. Specifically, the Commonwealth asserts the jury could have concluded from the evidence that, in each incident, Chavarria's penis touched D.M.'s buttocks before penetration and that Chavarria touched D.M.'s buttocks with his hand or fingers on at least one occasion. Chavarria counters that D.M.'s testimony, to which the Commonwealth refers in support of its argument, that Chavarria touched D.M. with his fingers, cannot be considered for its truth because those statements were made in the context of D.M. being impeached with prior inconsistent statements made during the preliminary hearing. Additionally, the rest of the testimony establishes that only a single act occurred in each incident, and no inference can be drawn from the testimony that anything else occurred.

"A motion to strike challenges whether the evidence is sufficient to submit the case to the jury." *Linnon v. Commonwealth*, 287 Va. 92, 98 (2014) (quoting *Lawlor v. Commonwealth*, 285 Va. 187, 223 (2013)); *see also* Rule 3A:15(a). "Whether the evidence adduced is sufficient to prove each of those elements is a factual finding, which will not be set aside on appeal unless it is plainly wrong." *Linnon*, 287 Va. at 98 (quoting *Lawlor*, 285 Va. at 223-24). In a sufficiency review, this Court "consider[s] the evidence presented at trial in the light most favorable to the Commonwealth,

the prevailing party below." *Bolden v. Commonwealth*, 275 Va. 144, 148 (2008).  This Court "also accord[s] the Commonwealth the benefit of all inferences fairly deducible from the evidence."  *Id.* (quoting *Riner v. Commonwealth*, 268 Va. 296, 303 (2004)).  "[W]e do not 'substitute our judgment for that of the trier of fact.'"  *Kelly v. Commonwealth*, 41 Va. App. 250, 257 (2003) (quoting *Wactor v. Commonwealth*, 38 Va. App. 375, 380 (2002)).  "Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

D.M. testified that during both incidents, Chavarria placed his penis "[b]etween D.M.'s cheeks" "[i]nside the hole."  He also testified that during both incidents, there was no touching prior to the penetration other than Chavarria pulling down D.M.'s pants.  During the trial, D.M. clarified what he meant in the preliminary hearing when he testified that Chavarria also touched D.M. with his hands and fingers.  D.M. explained that, during the Byrd Street incident, Chavarria "used his hands to grab [D.M.]" "[t]o . . . hold [him]."  D.M. could not recall whether "any other part of [Chavarria's] body, other than his penis, came in contact with [D.M.'s] butt."

Based on the evidence presented, even disregarding the portion of D.M.'s testimony during the preliminary hearing that Chavarria used his hands and fingers, the trial court did not err in denying the motion to strike and the motions to set aside the verdict on the two counts of aggravated sexual battery.  The very act of anal penetration with a penis necessarily involves the touching of an intimate part, i.e., the buttocks or anus, as defined by Code § 18.2-67.10(2).  As the Commonwealth noted at trial, one "cannot touch the inside of the anus without also touching the outside of the anus."  This conclusion addresses only the actus reus component of "sexual abuse," that is, the intentional touching of a complaining witness's intimate parts or the material directly covering such intimate parts.  *See* Code § 18.2-67.10(6)(a).  The jury could permissibly infer the required specific

intent to sexually molest, arouse, or gratify from the nature and circumstances of the anal penetration of a young child. The inference, however, arises from the evidence in this case rather than from any rule that the "sexual abuse" intent is inherent in every object sexual penetration. Moreover, Chavarria does not argue on appeal that the evidence was insufficient to establish sexual intent and thus cannot ask this Court to find otherwise.

### III. Motion for a Mistrial or Investigation of Juror Communication

Finally, Chavarria asserts the trial court erred in failing to set aside the verdict or grant a mistrial based on a private external communication with a juror prior to deliberations. Additionally, Chavarria argues the trial court erred in failing to question the excused juror who made the communication to the sitting juror. The Commonwealth responds that this assignment of error is procedurally defaulted under Rule 5A:18. This Court agrees with the Commonwealth that Chavarria's fourth assignment of error was not sufficiently preserved for appellate review.

Under Rule 5A:18,

> No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice. A mere statement that the judgment or award is contrary to the law and the evidence is not sufficient to preserve the issue for appellate review.

Code § 8.01-384 "inform[s] an interpretation of Rule 5A:18." *Brown v. Commonwealth*, 279 Va. 210, 217 (2010); *see also Helms v. Manspile*, 277 Va. 1, 6 (2009). Under the Code, it is "sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take or his objections to the action of the court and his grounds therefor." Code § 8.01-384(A). "Specificity and timeliness undergird the contemporaneous-objection rule." *Bethea v. Commonwealth*, 297 Va. 730, 743 (2019). "Specific, timely objections are required because they are often resolved, either because the trial court intervenes with a corrective ruling that accommodates the asserted interests of both sides or because

opposing counsel gives a winning explanation that moots the objection altogether." *Id.* at 744. In short, "if a trial court is aware of a litigant's legal position and the litigant did not expressly waive such arguments, the arguments remain preserved for appeal." *Brown*, 279 Va. at 217.

With respect to alleged juror misconduct, appellate review of such misconduct is waived "when a defendant learns of alleged juror misconduct during the trial, but fails to move for a mistrial at the time the misconduct is discovered." *Perry v. Commonwealth*, 58 Va. App. 655, 676, 679-80 (2011) (holding "that appellant's failure to object or request relief when the juror's alleged inattention was brought to his attention at trial constituted both a failure to timely demand a mistrial and a failure to preserve the assignment error for appellate review" (citations omitted)); *see also Riner*, 268 Va. at 318 (appellate review waived where defendant did not move for mistrial at time he heard about anonymous note to the Commonwealth's Attorney); *Green v. Commonwealth*, 26 Va. App. 394, 402 (1998) (appellate review of trial court's denial of defendant's "post-verdict motion to recall the 'whole jury' and identify and investigate the juror referenced in the note" waived because "defendant made no effort to pursue such relief when the issue first arose during trial"); *Yeatts v. Commonwealth*, 242 Va. 121, 137 (1991) ("Making a timely motion for mistrial means making the motion 'when the objectionable words were spoken.'" (quoting *Reid v. Baumgardner*, 217 Va. 769, 774 (1977))). This strict waiver rule is predicated on fairness.

> To permit prisoners to avail themselves, after verdict, of pre-existing objections to the competency of jurors, as a matter of right, would not only be unreasonable, but most mischievous in its consequences . . . . A prisoner knowing, or *willfully remaining ignorant* of the incompetency of a juror, would take the chances of a favorable verdict . . . ; and if the verdict should be adverse, would . . . [seek to] avoid its effect.

*Perry*, 58 Va. App. at 679 (quoting *Green*, 26 Va. App. at 402).

Here, appellate review of the trial judge's decisions to deny the motion for a mistrial and not to question the excused juror is waived. Defense counsel was fully aware of the alleged juror misconduct prior to the jury verdict and yet still chose to move for a mistrial on the basis of such alleged misconduct only after the return of the verdict. Additionally, defense counsel only specifically objected to the trial judge's failure to question the excused juror in his motion to set aside the verdict, which he filed on September 3, 2024, over three months after defense counsel's proffer of the juror communication.[11]

---

[11] Chavarria argues that his post-trial pleadings and arguments were sufficient to preserve this assignment of error for appellate review based on *Thompson v. Commonwealth*, 219 Va. 498 (1978). In *Thompson*, the Supreme Court of Virginia addressed whether the trial court abused its discretion in failing to order a mistrial based on juror misconduct. 219 Va. at 504. The juror misconduct at issue involved two jurors reading a newspaper article about Thompson's criminal case. *Id.* at 502-03. On the second day of trial, defense counsel reminded the trial court that it had a matter it wanted to inquire of the jury, to which the court responded, "Oh, yes," and proceeded to ask the jury whether any of the jurors had read the newspaper article. *Id.* After an exchange between the judge and two jurors, closing arguments proceeded. *Id.* at 503. At that time, the defendant made no objection either to the jurors reading the article or the manner in which the examination of the jurors took place. *Id.* at 503-04. While the jury was deliberating, defense counsel moved for a mistrial based on the two jurors reading the newspaper article. *Id.* at 504. The trial court denied the motion for a mistrial, finding that the article was not prejudicial and that the motion was untimely. *Id.* On appeal, the defendant argued the jurors engaged in prejudicial conduct and that the trial court should have implemented the procedure adopted in *United States v. Hankish*, 502 F.2d 71 (4th Cir. 1974), which outlined how questioning of jurors must take place when prejudicial publicity is involved. *Thompson*, 219 Va. at 504. Despite the lack of objection by defense counsel immediately after the jurors were questioned, the Supreme Court of Virginia proceeded to consider and affirm the trial court's ruling that the content of the newspaper was not prejudicial and expressed no opinion as to whether the procedure in *Hankish* should be followed by trial courts in Virginia. *Id.* at 505.

Chavarria contends that the fact that the Supreme Court addressed the substantive issue on the merits when no motion was made before jury deliberations means that juror misconduct claims can be properly raised and preserved through post-trial motions. *Thompson*, however, is distinguishable from the instant case. In *Thompson*, the trial court questioned the jury only *after* defense counsel prompted the trial court to do so. 219 Va. at 502-03. Although the prompting was a vague reminder, it was clear that the judge and defense counsel had discussed the possible issue of prejudicial publicity prior to the inquiry of the jury, so defense counsel was not required to specifically state, "Judge, I request that you question the jurors about x issue." By prompting the trial court, defense counsel provided the court with the opportunity to rule on the specific relief requested, and the Supreme Court implicitly found that no further objection was needed to preserve the issue for appeal. *See Brown*, 279 Va. at 217. Thus, preservation in *Thompson* was a

Chavarria argues that the proffer of the juror communication was sufficient to preserve his arguments on appeal. He specifically notes the following statement made by defense counsel during the proffer: "That's the extent of my proffer. I think it's, you know, it is a problem. I don't know that there's a solution, again, without interrogating, honestly, Ms. Fairfax. But, that's the --." The trial judge responded, "I'm not going to do that at this juncture, based on that representation. If there's something more specific, like, 'I thought he was guilty,' or, you know, anything along those lines --." Chavarria asserts these statements comply with Rule 5A:18 and Code § 8.01-384 because

> he made "known to the court the action which he desire[d]," the interrogation of Ms. Fairfax, and "his grounds therefor," that her proffered contact with a sitting juror was a problem. Va. Code § 8.01-384. The trial court clearly understood the request and the basis as it immediately ruled on the request and denied it based on the substance of the proffer.

Contrary to this argument, however, Rule 5A:18 and Code § 8.01-384 require parties to make *specific* requests for relief or objections along with the grounds for such relief or objection. Chavarria did not specifically request that the trial judge interrogate Ms. Fairfax, nor did he explain how the alleged communication was problematic.[12] Judges are generally not required to

---

result of prompting the judge at the time the misconduct was discovered and not by the post-trial motion.

In contrast, defense counsel in the instant case did not specifically state he was requesting the trial court to question Ms. Fairfax. Instead, defense counsel merely suggested that questioning Ms. Fairfax could be a solution. Further, the trial court's response that it would not "do that at this juncture, based on that representation," does not indicate that defense counsel had made a request or that the trial court had an adequate opportunity to rule. Such a response was merely a statement that the trial court was not going to sua sponte question Ms. Fairfax without a specific request to do so or a more specific proffer.

[12] Alternatively, defense counsel could have requested a brief recess to question Ms. Fairfax himself outside of court in order to provide the trial court with a more expansive proffer of the juror communication, and defense counsel was not precluded from doing his own investigation and could have raised the issue again upon learning more information about the communication.

afford relief not specifically requested.  Thus, Chavarria's fourth assignment of error was not sufficiently preserved for appellate review.

CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

*Affirmed.*